# SUPERINTENDENT OF INSURANCE OF NEW YORK *v.* BANKERS LIFE & CASUALTY CO. ET AL.

No. 70–60.   Argued October 13, 1971—Decided November 8, 1971

*Arnold Bauman* argued the cause for petitioner. With him on the briefs was *Morton J. Schlossberg.*

*William W. Karatz* argued the cause and filed a brief for respondent Irving Trust Co. *Irving Parker* argued the cause for respondent Bankers Life & Casualty Co. With him on the brief were *William T. Kirby* and *Isaac M. Bayda. William E. Willis* and *Michael M. Maney* filed a brief for respondents Belgian-American Banking Corp. et al. *William Heller* filed a brief for respondents Garvin, Bantel & Co. et al.

*Walter P. North* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Griswold, Peter L. Strauss, Philip A. Loomis, Jr.,* and *Theodore Sonde.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Manhattan Casualty Co., now represented by petitioner, New York's Superintendent of Insurance, was, it is alleged, defrauded in the sale of certain securities in violation of § 17 (a) of the Securities Act of 1933, 48 Stat. 84, 15 U. S. C. § 77q (a), and of § 10 (b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j (b). The District Court dismissed the complaint, 300 F. Supp. 1083, and the Court of Appeals affirmed, by a divided bench. 430 F. 2d 355. The case is here on a petition for a writ of certiorari which we granted, 401 U. S. 973.

It seems that Bankers Life & Casualty Co., one of the respondents, agreed to sell all of Manhattan's stock to one Begole for $5,000,000. It is alleged that Begole conspired with one Bourne and others to pay for this stock, not out of their own funds, but with Manhattan's assets. They were alleged to have arranged, through Garvin,

8

Bantel & Co.—a note brokerage firm—to obtain a $5,000,000 check from respondent Irving Trust Co., although they had no funds on deposit there at the time. On the same day they purchased all the stock of Manhattan from Bankers Life for $5,000,000 and as stockholders and directors, installed one Sweeny as president of Manhattan.

Manhattan then sold its United States Treasury bonds for $4,854,552.67.[1] That amount, plus enough cash to bring the total to $5,000,000, was credited to an account of Manhattan at Irving Trust and the $5,000,000 Irving Trust check was charged against it. As a result, Begole owned all the stock of Manhattan, having used $5,000,000 of Manhattan's assets to purchase it.

To complete the fraudulent scheme, Irving Trust issued a second $5,000,000 check to Manhattan which Sweeny, Manhattan's new president, tendered to Belgian-American Bank & Trust Co. which issued a $5,000,000 certificate of deposit in the name of Manhattan. Sweeny endorsed the certificate of deposit over to New England Note Corp., a company alleged to be controlled by Bourne. Bourne endorsed the certificate over to Belgian-American Banking Corp.[2] as collateral for a $5,000,000 loan from Belgian-American Banking to New England. Its proceeds were paid to Irving Trust to cover the latter's second $5,000,000 check.

Though Manhattan's assets had been depleted, its books reflected only the sale of its Government bonds and the purchase of the certificate of deposit and did

---

[1] Manhattan's Board of Directors was allegedly deceived into authorizing this sale by the misrepresentation that the proceeds would be exchanged for a certificate of deposit of equal value.

[2] Belgian-American Banking at the same time made a loan to New England Note in the amount of $250,000 which was distributed in part as follows: Belgian-American Banking $100,000, Bourne $50,000, Begole $50,000, and Garvin, Bantel $25,000.

not show that its assets had been used by Begole to pay for his purchase of Manhattan's shares or that the certificate of deposit had been assigned to New England and then pledged to Belgian-American Banking.

Manhattan was the seller of Treasury bonds and, it seems to us, clearly protected by § 10 (b), 15 U. S. C. § 78j (b), of the Securities Exchange Act,[3] which makes it unlawful to use "in connection with the purchase or sale" of any security "any manipulative or deceptive device or contrivance" in contravention of the rules and regulations of the Securities and Exchange Commission.[4]

There certainly was an "act" or "practice" within the meaning of Rule 10b–5 [5] which operated as "a fraud or deceit" on Manhattan, the seller of the Government bonds. To be sure, the full market price was paid for those bonds; but the seller was duped into believing that it, the seller, would receive the proceeds. We cannot

---

[3] Section 10 (b) provides:

"It shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

[4] Rule 10b–5, 17 CFR § 240.10b–5, provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

[5] N. 4, *supra*.

agree with the Court of Appeals that "no investor [was] injured" and that the "purity of the security transaction and the purity of the trading process were unsullied." 430 F. 2d, at 361.

Section 10 (b) outlaws the use "in connection with the purchase or sale" of any security [6] of "any manipulative or deceptive device or contrivance." The Act protects corporations as well as individuals who are sellers of a security. Manhattan was injured as an investor through a deceptive device which deprived it of any compensation for the sale of its valuable block of securities.

The fact that the fraud was perpetrated by an officer of Manhattan and his outside collaborators is irrelevant to our problem. For § 10 (b) bans the use of any deceptive device in the "sale" of any security by "any person." And the fact that the transaction is not conducted through a securities exchange or an organized over-the-counter market is irrelevant to the coverage of § 10 (b). *Hooper* v. *Mountain States Securities Corp.*, 282 F. 2d 195, 201. Likewise irrelevant is the fact that the proceeds of the sale that were due the seller were misappropriated.[7] As the Court of Appeals for the Fifth

---

[6] Section 3 (a) (10) of the 1934 Act defines "security" very broadly (see *Tcherepnin* v. *Knight*, 389 U. S. 332) and clearly embraces Treasury bonds.

[7] See, *e. g., Allico Nat. Corp.* v. *Amalgamated Meat Cutters & Butcher Workmen of North America*, 397 F. 2d 727 (CA7 1968), which held sufficient under § 10 (b) and Rule 10b–5 a complaint which charged that defendant union, upon discovering that a third party would pay a higher price, breached a prior agreement to sell 100% of the stock in a wholly owned life insurance company to plaintiffs. The court placed primary reliance on the fact that in the course of the transaction, the union misappropriated some 25,000 shares of the life insurance company's stock which had previously been sold to plaintiffs for cash, but which were being held in escrow pending consummation of the agreement.

"Even if a breach of contract in order to make a more favorable

Circuit said in the *Hooper* case, "Considering the purpose of this legislation, it would be unrealistic to say that a corporation having the capacity to acquire $700,000 worth of assets for its 700,000 shares of stock has suffered no loss if what it gave up was $700,000 but what it got was zero." 282 F. 2d, at 203.

The Congress made clear that "disregard of trust relationships by those whom the law should regard as

contract would not in itself be sufficient [to confer jurisdiction under § 10 (b)], we have more here. The motivation not only is said to induce a breach of contract . . . but also to induce the conversion of plaintiffs' pledged 25,000 shares." *Id.*, at 729–730. See also *Cooper* v. *North Jersey Trust Co.*, 226 F. Supp. 972 (SDNY 1964), in which a conspiracy to loan plaintiff money to buy securities, followed by the misappropriation of the purchased securities when they were pledged to secure the loan, was held to violate § 10 (b) and Rule 10b–5.

Indeed, misappropriation is a "garden variety" type of fraud compared to the scheme which gave rise to *A. T. Brod & Co.* v. *Perlow*, 375 F. 2d 393 (CA2 1967). That case involved an action by a broker against its own customers for the recovery of losses suffered when defendant customers refused to pay for securities previously ordered which had decreased in value by the settlement date. The complaint charged that this refusal to honor the purchase order was part of the customers' deceptive plan only to pay for securities purchased for their account when those securities had appreciated in value by the date payment was due.

Rejecting the customers' pleas that "no fraud is alleged as to the investment value of the securities nor any fraud 'usually associated with the sale or purchase of securities,'" *id.*, at 396, the Court of Appeals for the Second Circuit—composed of a different panel from the one sitting in the instant case—reversed the District Court's dismissal of the complaint.

"[We do not] think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities.' We believe that § 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws." *Id.*, at 397.

fiduciaries, are all a single seamless web" along with manipulation, investor's ignorance, and the like. H. R. Rep. No. 1383, 73d Cong., 2d Sess., 6. Since practices "constantly vary and where practices legitimate for some purposes may be turned to illegitimate and fraudulent means, broad discretionary powers" in the regulatory agency "have been found practically essential." *Id.*, at 7. Hence we do not read § 10 (b) as narrowly as the Court of Appeals; it is not "limited to preserving the integrity of the securities markets" (430 F. 2d, at 361), though that purpose is included. Section 10 (b) must be read flexibly, not technically and restrictively. Since there was a "sale" of a security and since fraud was used "in connection with" it, there is redress under § 10 (b), whatever might be available as a remedy under state law.

We agree that Congress by § 10 (b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement. But we read § 10 (b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face. And the fact that creditors [8] of the defrauded corporate buyer or seller of securities may be the ultimate victims does not warrant disregard of the corporate entity. The controlling stockholder owes the corporation a fiduciary obligation—one "designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders." *Pepper* v. *Litton,* 308 U. S. 295, 307.

The crux of the present case is that Manhattan suffered an injury as a result of deceptive practices touch-

---

[8] The history of the Act shows that Congress was especially concerned with the impact of frauds on creditors of corporations. See H. R. Rep. No. 1383, 73d Cong., 2d Sess., 3–4.

ing its sale of securities as an investor. As stated in *Shell* v. *Hensley,* 430 F. 2d 819, 827:

> "When a person who is dealing with a corporation in a securities transaction denies the corporation's directors access to material information known to him, the corporation is disabled from availing itself of an informed judgment on the part of its board regarding the merits of the transaction. In this situation the private right of action recognized under Rule 10b–5 [9] is available as a remedy for the corporate disability."

The case was before the lower courts on a motion to dismiss.

Bankers Life urges that the complaint did not allege, and discovery failed to disclose, any connection between it and the fraud and that, therefore, the dismissal of the complaint as to it was correct and should be affirmed. We make no ruling on this point.

The case must be remanded for trial. We intimate no opinion on the merits, as we have dealt only with allegations and with the question of law whether a cause of action as respects the sale by Manhattan of its Treasury bonds has been charged under § 10 (b).[10] We think it

---

[9] It is now established that a private right of action is implied under §10(b). See 6 L. Loss, Securities Regulation 3869–3873 (1969); 3 L. Loss, Securities Regulation 1763 *et seq.* (2d ed. 1961). Cf. *Tcherepnin* v. *Knight,* 389 U. S. 332; *J. I. Case Co.* v. *Borak,* 377 U. S. 426.

[10] Petitioner's complaint bases his single claim for recovery alternatively on three different transactions alleged to confer jurisdiction under § 10 (b): Manhattan's sale of the Treasury bonds; the sale of Manhattan stock by Bankers Life to Bourne and Begole; and the transactions involving the certificates of deposit. We only hold that the alleged fraud is cognizable under § 10 (b) and Rule 10b–5 in the bond sale and we express no opinion as to Manhattan's standing under § 10 (b) and Rule 10b–5 on other phases of the com-

14

has been so charged and accordingly we reverse and remand for proceedings consistent with this opinion.

All defenses except our ruling on § 10 (b) will be open on remand.

*Reversed.*

---

plaint. See Kellogg, The Inability to Obtain Analytical Precision Where Standing to Sue Under Rule 10b–5 is Involved, 20 Buffalo L. Rev. 93 (1970); Lowenfels, The Demise of the *Birnbaum* Doctrine: A New Era For Rule 10b–5, 54 Va. L. Rev. 268 (1968).