Simon V. **HABERMAN**, Plaintiff-Appellant,

v.

John D. **MURCHISON** et al., Defendants-Appellees.

No. 729, Docket 72-1138.

United States Court of Appeals, Second Circuit.

Submitted May 10, 1972.

Decided Oct. 30, 1972.

Bennett Frankel, New York City, for plaintiff-appellant.

Debevoise, Plimpton, Lyons & Gates, New York City (J. Asa Rountree, Norman A. Senior), New York City, for defendants-appellees John D. Murchison, Clint W. Murchison, Jr., and Murchison Brothers.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City (Paul W. Williams, Joel C. Balsam, Michael D. Cahn), New York City, for defendant-appellee Donald D. Harrington.

Before ANDERSON, McGOWAN * and TIMBERS, Circuit Judges.

McGOWAN, Circuit Judge:

This appeal relates to a further chapter in the extraordinarily litigious history of Alleghany Corporation. Appellant is an Alleghany stockholder who asserts derivatively in its right certain claims against former officers and directors for damages payable to the corporation. Only three of the named defendants (apart from the nominal Alleghany) were served with process, i. e., John D. Murchison and Clint W. Murchison, Jr., individually and as a partnership, and Donald D. Harrington. They have prevailed in the District Court, where the merits of an amended complaint were adjudicated on cross-motions for summary judgment. Haberman v. Murchison, 331 F.Supp. 180, aff'd on rehearing, 335 F.Supp. 286 (S.D.N.Y.1971). The evidentiary record for this purpose consisted, by agreement of the parties, solely of the testimony and exhibits in a Securities and Exchange Commission proceeding. Jurisdiction in the District Court was asserted to rest upon (1) diversity of citizenship, which was unchallenged, and (2) federal causes of action allegedly arising under the Securities and Exchange Act of 1934, 15 U.S.C. § 78a et seq., a contention which was attacked by appellees.

The core issue, to which the other claims are mainly incidental, relates to whether appellees realized, upon the sale by them of shares of Alleghany, a premium attributable to a transfer of management control. The SEC, considering the control issue on the same evidence as was later before the District Court, determined that there was no transfer of control; and that decision was sustained upon direct review in this court. Phillips v. SEC, 388 F.2d 964 (2d Cir. 1968). Although the issue arises in this litigation in a common law and differing statutory context, the District Court reached the same conclusion. We find no warrant for disturbing its judgment in this or any other of its aspects; and, for the reasons hereinafter appearing, we affirm the District Court's dismissal of appellant's action.

I

This suit has its source in a series of events following a proxy contest in 1961 in which the Murchisons and their associates successfully wrested control of Alleghany from Allan P. Kirby. Although the Murchisons were able on that occasion to elect a board of directors of their own choice, Kirby retained control of the largest single block of shares in the Corporation—more than 3,300,000 shares, or 33 percent of the outstanding common stock. Kirby, moreover, continued to exert every effort to regain control, and succeeded in largely frustrating the Murchisons' program for Alleghany.[1]

---

\* Of the United States Court of Appeals for the District of Columbia Circuit, sitting by designation.

1. The Alleghany stock directly owned by the Murchisons in the summer of 1962 amounted to 19.5% of the total outstanding. Another 15% was in the hands of majority-owned subsidiaries or friends and associates.

Immediately after their victory in the 1961 proxy fight, the Murchisons offered two seats on the Alleghany board to Kirby in an effort both to enlist his cooperation in the conduct of its business and in recognition of his substantial ownership interest. Kirby would, however, have nothing to do with the Murchisons and launched an active campaign to bring about his return to control of the corpora-

Prior to the annual stockholders meeting on April 9, 1962, the management solicited proxies for the reelection of the board of directors. Although appellee Harrington, one of the nominees, had previously expressed to John Murchison, who had become president of Alleghany the preceding year, his desire to retire from the board, he consented to the placement of his name in nomination for an additional term, and in due course was elected with the rest of the Murchison nominees. Neither Harrington's desire to step down from the board, nor the difficulty the Murchison group was having with Kirby, were referred to in the proxy statement.

Following the May, 1962 break in the stock market, the value of Alleghany common stock dropped precipitously. From a high in March of $12¼ the stock fell to a low of $6⅞ in June. Thereafter, the price fluctuated considerably, rising gradually to $7⅞ on August 14, to $9⅜ on October 5, and finally to $13 in January, 1963. In May and June, 1962 the Murchison board of directors authorized the purchase by Alleghany of some $2,000,000 of its own outstanding common stock and the stock of two subsidiaries, Investors Diversified Services, Inc., and New York Central. In a letter to the stockholders dated August 13, 1962, John Murchison characterized this purchase as an attractive investment in light of the fact that market price was well below net asset value.

In July of 1962, the Murchisons were approached by one Bertin Gamble for the sale of some part of their holdings in Alleghany. The idea for the purchase of Alleghany stock was first suggested to Gamble by an investment banker, Charles Allen, who thought that Gamble, on acquiring a significant Alleghany interest, might, as Allen testified, "perhaps act as a balance wheel . . . thinking that he could get along with Kirby and solve this whole situation." Allen estimated that a fair price for the stock, based on net asset value, would be in a range of from $10 to $12 a share.

On August 14 the parties entered into preliminary agreements calling for the immediate sale to Gamble of 1,500,000 shares at $10 per share, a right in the buyer to "call" (or buy) an additional 1,500,000 to 2,000,000 shares at the same price any time before May 31, 1963, and, in the event the call was not exercised, a right in the sellers to "put" (or sell) 1,500,000 to 2,000,000 shares at the same price between June 1 and June 30, 1963.[2] These terms were finally agreed to and the contract executed on October 5, 1962, at which time its terms were made known to the public. The put and call agreement was later extended, and Gamble exercised his call for an additional 1,834,755 shares on October 31, 1963. Although this agreement was negotiated by the Murchisons alone, thirty-seven of their associates also participated in either the initial sale or the put and call agreement.

Several days prior to October 5, 1962, John Murchison approached Harrington with an offer to buy 170,000 of Harrington's 186,000 shares in Alleghany. Harrington was receptive, and the price

tion, which included sustained public and private criticism of the Murchisons' management policies and a search for allies among Alleghany's existing and potential shareowners.

2. It seems clear that Gamble initially discussed with the Murchisons a purchase of only part of their stock, but his interest in purchasing all of it grew as he discovered the degree of their discouragement about the Kirby situation, and contrasted that with his own confidence that he could get along with anybody, including Kirby.

The testimony is that he was told initially that "this was not an easy situation and unless he thought he could get along with Mr. Kirby," there was no point in his getting involved at all. It was also pointed out to him that, even if he acquired all of the Murchison stock, his own holdings would not in and of themselves enable him to elect a majority of the board; and that, absent agreement between him and Kirby, one to one and one-half million shares more than the Murchisons could deliver would be necessary to assure him control.

negotiated between them was $12.19 per share, a price approximating Harrington's original investment. According to Harrington, he was at that time ignorant of the agreement between the Murchisons and Gamble. On October 9, having sold substantially all of his interest, Harrington resigned from the board.

On October 9, 1962 Gamble and his attorney were elected to the board to replace Harrington and Dan Kimball, a named but unserved defendant in this action, who had also resigned. The remaining eight seats continued to be held by the Murchison group until the next stockholders meeting. Because neither of the parties had yet exercised their rights under the put and call agreement —thus leaving uncertain the ultimate ownership of a substantial portion of the voting stock—that meeting was postponed by the board from April to December, 1963.

In December, 1962, John Murchison resigned as president of Alleghany and Gamble was elected to replace him.[3] Later that month, an application was filed with the SEC by Randolph Phillips, requesting a determination that the foregoing transactions resulted in the vesting of control of Alleghany in Gamble.[4] From January to September, 1963, hearings were held before the SEC, on the basis of which the Commission ultimately concluded that, for purposes of Section 2(a)(9) of the Investment Company Act, 15 U.S.C. § 80a–2(a)(9), control had not vested in Gamble or his associates. As noted above, this court affirmed the Commission's determination in Phillips v. SEC, 388 F.2d 964 (2d Cir. 1968).

During this period, Gamble's efforts to mediate between Kirby and the incumbent board, and to establish an amicable working arrangement with Kirby, either for himself or for the Murchisons, met with failure. Finally, on October 31, 1963, the same day that Gamble exercised his call against the Murchisons, Gamble sold 1,600,000 shares at $10.50 a share to Kirby and two companies allied with him. At the December, 1963, shareholders meeting, Kirby and his associates, now firmly in control, installed a new board of directors with Kirby as chairman.

The foregoing events form the basis of this action, which was originally filed as a one-count complaint by a plaintiff named Smith who was not a resident of New York. That complaint charged appellees principally with

(1) receiving a premium for their sale of stock in exchange for their corporate offices and control of the corporation;

(2) withholding from other stockholders material inside information (*i. e.*, their agreement with Gamble);

(3) using their fiduciary positions to induce Alleghany to buy its own stock and the stock of its subsidiaries for the purpose of inflating the market and strengthening their own bargaining position with Gamble; and

(4) issuing false and misleading proxy statements for their own advantage;

and it concluded that

"[T]he aforesaid acts operated as a fraud or deceit upon plaintiff and other shareholders of Alleghany in violation of Sections 10(b), 13(a), 14(a), and 16(a) of the Securities and Exchange Act of 1934 and the rules and regulations thereunder, . . .

---

3. The testimony was that Murchison had tried to find someone independent of any faction to serve as president and, failing that, had suggested to Gamble that he serve. Gamble urged Murchison to continue, and very reluctantly consented at the last moment to take the job. He told the board electing him that his disillusionment with the Kirby situation was such that, unless the could buy out Kirby, he would probably sell his own shares to Kirby.

4. Phillips' purpose in seeking this determination related to the recovery of fees by various mutual funds having contracts with Investors Diversified Services, Inc., an Alleghany subsidiary. Phillips describes himself as acting as "consultant" to the plaintiff in this action.

and constituted a violation of the fiduciary duties of said defendants under the common law and General Corporation Law of Maryland."

The claims in the original complaint founded upon the federal securities laws were dismissed by Judge Bryan of the District Court as not having stated a claim upon which relief could be granted. Noting that the remaining claims under state law remained before it because of the diverse citizenship of the parties, the court ruled that, because none of the parties were citizens of New York and the action arose in Dallas, Texas, venue in New York was improper, and accordingly ordered the case transferred to the United States District Court for the Northern District of Texas. Smith v. Murchison, 310 F.Supp. 1079 (S.D.N.Y.1970). Before it was actually transferred, however, the plaintiff filed a motion to substitute a New York plaintiff and to amend the complaint with respect to the federal claims. This motion was granted, and the order transferring the action vacated.

The suit under the amended complaint proceeded before Judge Gurfein. The first count of this three-count complaint merely reiterated the original complaint. The new second and third counts, while apparently directed to curing the defects in the federal claims articulated by Judge Bryan, added nothing of substance, but merely focused more sharply on the claim that appellees issued a false proxy statement and used inside corporate information for their own profit. Both sides moved for summary judgment, and stipulated that the SEC hearing record might be used for all purposes in determining the motions. This stipulation was later enlarged to include the agreement that "no issue of credibility exists" with respect to the testimony and exhibits in that record.

Although appellees also submitted a motion to dismiss on the grounds that the action was barred by the statute of limitations, the District Court declined to reach that question and granted appellees' motion for summary judgment on the merits. In view of our disposition, we also deem it unnecessary to consider the limitations question.

II

Appellant's principal contention that he has a meritorious cause of action under the 1934 Act appears to be that appellees, in agreeing to sell their shares to a third party at a price above the current market price without either informing or inviting all other shareholders to participate, withheld material inside information in violation of Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. However, as the District Court held, Section 10(b) and Rule 10b–5 afford protection only to those who actually purchase or sell securities to their loss in reliance upon the withholding or misrepresentation of material information or other manipulative or deceptive devices. Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1962); Greenstein v. Paul, 400 F.2d 580 (2d Cir. 1968); Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); Hoover v. Allen, 241 F.Supp. 213 (S.D.N.Y.).[5] Neither

---

5. Nothing in the Supreme Court's opinion in Supt. of Insurance of New York v. Bankers Life and Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), is to the contrary. Although the Court there reversed this court's holding that Section 10(b) extended only to fraudulent or manipulative sales and not to the fraudulent appropriation of the proceeds of a sale, it in no way suggested a rejection of the rule that a plaintiff under Section 10(b) must be a party to the sales transaction. The Court made clear that

> Manhattan [the injured party] was the *seller* of Treasury bonds and, it seems to us, clearly protected by § 10(b). . . .
> The Act protects corporations as well as individuals who are *sellers* of a security. 404 U.S. at 9, 10, 92 S.Ct. at 167–168. (Emphasis supplied)

appellant nor Alleghany, on whose behalf this action was brought and for whom alone damages are sought, falls remotely within that class. Even assuming, *arguendo*, that the intention or agreement of a substantial shareholder to sell his interest is "material inside information," that information was obviously known to the purchaser, Gamble. Moreover, the fact that Kirby was frustrating the Murchison program for Alleghany—also alleged to be material inside information—was not only known by Gamble, but was, indeed, his principal reason for buying the stock.

Appellant's reliance on SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2nd Cir. 1968), (*en banc*), cert. denied, Coates v. Securities and Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), to support his Rule 10b–5 claim is misplaced. The liability of insider's in that case was firmly predicated on the view that the paramount purpose of Section 10(b) and Rule 10b–5 was to protect purchasers and sellers of securities from those who deal unfairly with them. *See* 401 F.2d at 847–852. On appeal from the remand in that case, this court upheld the remedy afforded by the District Court, under the terms of which the defendants were required to make restitution of their profits by payments into an escrow fund from which those who were able to demonstrate loss from the defendants' actions would be compensated. SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301 (2d Cir.), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971). While it is true that we also upheld the provision that the undistributed balance of the fund would, after five years, be distributed to the corporation—in effect, a conditional recovery for the corporation —we did so principally in deference to the District Court's broad discretion under the Act to fashion a remedy most equitable under the circumstances. In approving that conditional remedy, we recognized, first, the inequity of permitting the defendants to retain the proceeds of their own wrong, and, second, that the corporation may itself have suffered injury to its integrity and reputation by the wrongful actions of the defendants. 446 F.2d at 1307–1308.

■ These considerations, however, should not obscure the fact that the essence of the 10b–5 *violation* in *Texas Gulf Sulphur* was the wrong done by the defendants to sellers on the open market not privy to the same material information. While there may be a parallel right, under *state* law, in the corporation to recover profits from insiders who use inside information to their own advantage, *see* Diamond v. Oreamuno, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969), there is no such derivative right under federal law. Since neither the corporation nor any purchaser was injured by the use of the alleged inside information in this case, no compelling reason has been advanced for the recognition of such a right here.

■■ Appellant also relies on a suggestion in Ferraioli v. Cantor, 281 F. Supp. 354 (S.D.N.Y.1967), that the failure of one group of stockholders to invite the participation of all other stockholders in a third party's offer to buy shares at a price above market value may in itself violate Section 10(b) and Rule 10b–5. The opinion in that case cited no authority for this proposition, which was expressly rejected by the District Court in this case. Perhaps under some circumstances the purchase of shares by one individual from another who has withheld from the seller the in-

In Drachman v. Harvey, 453 F.2d 722 (2d Cir. 1972) (*en banc*), this court has recently indicated its continuing assumption of the purchaser-seller requirement. In neither *Bankers Life* nor *Drachman* did diversity jurisdiction exist, and each was considered on motions to dismiss for want of federal jurisdiction. In the appeal before us, the District Court determined the merits on a full factual record. Thus, even if appellant be thought to have stated a federal cause of action entitling him to a determination of the merits, that determination was made here adversely to appellant.

formation that the buyer has been offered a greater price for the same shares might be a deceptive practice within the meaning of Section 10(b). But, as a general rule, we agree with the view expressed by Judge Pollack in Christophides v. Porco, 289 F.Supp. 403, 405 (S.D.N.Y.1968), that, "There is no obligation . . . to 'share and share alike'." In any event, unlike the circumstances here, the plaintiff in *Ferraioli* specifically alleged that he had sold shares to his loss which he would not have sold had the information not been withheld.

Appellant's other attempts to fit the facts of this case into a Rule 10b–5 claim are equally without merit. He first argued in the District Court that the purchase by Alleghany of its own securities in the summer of 1962 satisfied the purchaser-seller requirement of *Birnbaum*. How that purchase was induced by appellees' withholding material information from Alleghany is not clear. In any event, as the District Court observed, since the market price of those securities almost doubled by January, 1963, Alleghany clearly suffered no injury as a result of that transaction.

■ In his brief on appeal, appellant seems to argue that other people who bought (or failed to sell) Alleghany during the period when appellees withheld their "inside information" might not have bought (or might have sold) had they known either that the Murchisons were planning to sell their entire interest or that they were stalemated by Kirby over the management of Alleghany. Not only is the record devoid of any evidence to support this speculation, but, in light of the subsequent rise in Alleghany's value, any individuals in that category obviously profited, rather than lost, from the non-disclosure.

The allegations under the Section 14(a) proxy provisions, 15 U.S.C. § 78n, suffer from much the same weaknesses, particularly when it is remembered that it is damage to Alleghany which is recoverable. Appellant first asserts that appellees failed to state in the March, 1962 proxy statement that (1) a substantial amount of the Murchison stock was pledged as security for various loans, (2) Harrington did not intend to serve a full term, and (3) difficulties were being experienced with Kirby—all in furtherance of their scheme to sell out their interests at a premium. Had this information not been omitted, appellant claims, appellees would not have been able to carry out their plan.

■ As to the first of these alleged defects in the proxy statement, the proxy rules in effect in 1962 contained no requirement that disclosure be made of the loan pledges. In the case of Harrington, the record supports the finding that, although he had indicated no great desire to continue indefinitely as a director, before the proxy statement was sent out he had, in good faith, responded affirmatively to the Murchisons' request that he continue. The allegation that the failure to disclose the difficulties with Kirby was an improper concealment was also repeated by appellant in his allegation with respect to the November, 1963 proxy statement, combined with a charge that Gamble's offer to pay a price above the market price was inside information which should have been made public. In March of 1962, however, the record does not show the Murchisons as having had conversations with anyone about selling their stock, and the fact that Gamble eventually made them an offer at a figure above the market price had been made public long before the distribution of the 1963 proxy or the filing of the 1962 annual report.

■ Appellant's efforts to link the alleged failures to meet statutory disclosure requirements with the alleged plan of appellees to sell their shares at an illegal premium impress us as unavailing in either fact or law. The statutory causes of action sounding in the 1934 Act, which appellant has alleged, are tangential at best to his central concern, which is his assertion that in the summer and fall of 1962 appellees fell below

the standard of fiduciary duty owed by them to Alleghany. That is a cause of action arising under state law, and no amount of forced employments and illogical invocations of the 1934 Act can make it otherwise.

### III

 It is not controverted that the governing law on the nonfederal claims is the law of Maryland,[6] and, that under that law, it is illegal to (1) sell a corporate office, or (2) sell management control of the corporation without also selling a controlling block of the voting stock. *See, e. g.,* McClure v. Law, 161 N.Y. 78, 55 N.E. 388 (1899); Essex Universal Corp. v. Yates, 305 F.2d 572 (2d Cir. 1962). Any part of the price received from the sale of one's stock which is attributable to the sale of either is recoverable by the corporation in an action at law. This is the law as the District Court stated it, and all appellant's other claims under state law ultimately rest on his contention that appellees sold their offices and control of Alleghany at a premium.

### 1. *The Alleged Premium*

 We note preliminarily, as did the District Court, some difficulties with appellant's assumption that the excess over market value received by appellees for their stock constituted the alleged premium.[7] The fact that the market quotations for Alleghany stock on August 14 and October 5, 1962 were lower than the sale price of $10 per share does not establish that part of the purchase price contained a premium, or that the premium was equivalent to that excess.[8] Charles Allen testified to having suggested that a fair price, based on net asset value, would be from $10 to $12 per share. Appellant argues that, had the Murchisons attempted to sell such a large block of shares on the market, they would probably not have received the $7⅞ per share quoted on August 14, much less the $10 per share they did receive. This argument proves nothing, since it is equally likely that had Gamble attempted to buy those shares on the market, he would have had to pay considerably more than an average of $10 per share. As it was, in fixing a purchase price on an agreement to be executed some months in the future, the parties were faced with a fluctuating market which they could have reasonably believed to be unrealistically and temporarily depressed. Under these circumstances, the District Court found that the net asset value was a rational basis for pricing, and the price so agreed upon was not in excess of it. That finding was certainly not clearly erroneous.

6. Since there is no precedent in Maryland law precisely on point, the task of the District Court was to predict what the law of Maryland would be. However, the principles governing the issue here have been fairly well established and generally accepted.

7. The question of the amount of the premium, of course, goes only to the issue of remedy. If it is clearly established that a promised transfer of office or control was an inducement to the buyer to purchase the seller's shares, it follows that some part of the price is necessarily attributable to the illegal consideration, and it would be a question of fact as to how much the office or control was worth to the buyer. Since market price is not always an ascertainable or invariably reliable yardstick, this question is often difficult. In a case, however, where the price received is not much different from either that generally available to the public or that which a reasonable buyer would pay without the alleged illegal consideration, those facts may not only reduce the recovery to insignificance, but also operate to cast doubt on the basic allegation that the transfer of office or control was in fact consideration for the sale. *See* Benson v. Braun, 8 Misc.2d 67, 155 N.Y.S. 2d 622 (Sup.Ct.Nassau Co., 1956).

8. The relevant inquiry is what a reasonable buyer would have paid for the shares without the accompanying transfer of office or control—something which current market quotations often may not accurately reflect. *See* Benson v. Braun, *supra,* note 7; Perlman v. Feldmann, 154 F. Supp. 436 (D.Conn.1957) (premium calculated on the basis of "enterprise value.").

The average price of $12.19 per share received by Harrington on his sale of 170,000 shares to John Murchison presents a more difficult question, but also fails to establish, without more, that it contained a premium for the sale of his directorship. Harrington testified that at the time he agreed to sell these shares he was unaware of the agreement between the Murchisons and Gamble, and that John Murchison neither discussed with him the question of his resignation from the Board nor made it part of the bargain between them.[9] As to the particular price agreed upon, Harrington stated only that it was a "negotiated price," although it is represented that it approximated his initial investment in Alleghany stock.

Despite this testimony, appellant asks us to reject the District Court's finding that Harrington did not sell his office at a premium, primarily on two grounds: First, considering the record as a whole —and in particular Harrington's prompt resignation on October 9—Harrington's self-serving protestations of innocence should be taken as incredible; and, second, that, even if Harrington were innocent of consciously selling his office to Gamble, John Murchison was not.

The first contention must be rejected primarily on the basis of the stipulation that "no issue of credibility exists with respect to the testimony in the SEC proceeding." Although appellant now objects to the use of this stipulation and maintains that credibility must be assessed on the basis of the record as a whole, a finding in appellant's favor on the issue of Harrington's alleged sale of office would clearly require resolving an issue of credibility against both Harrington and John Murchison, in violation of the plain words of a stipulation freely entered into.[10] In any event, there is no evidence in the record which would render Harrington's version of events incredible on its face, and his subsequent resignation from the Board is as credibly explained by his conceded and long-standing desire to sit only in order to protect his investment as by any suggestion that it was part of the bargain in selling his shares.[11] Thus, while we cannot subscribe entirely to the District Court's observation that "(Harrington) got substantially what the others in the Murchison group got," p. 292 of 335 F.Supp., we leave intact the finding that he did not sell his office at a premium.[12]

9. John Murchison later testified that Harrington *was* aware of the Murchison-Gamble agreement when he agreed to sell his shares. However, on the critical issue of whether Harrington's resignation was discussed or made part of the bargain, both men were emphatic in their denials.

10. In its supplemental opinion, 335 F. Supp. 286, 292–293, the District Court gave appellant the benefit of the doubt on this issue and ruled in appellees' favor on the basis of the record as a whole. Even if the stipulation be disregarded, we cannot say that that finding is clearly erroneous.

11. The District Court found that "[Harrington] had decided to resign as a director earlier . . . . When he sold out he naturally carried out his original inclination and resigned." 331 F.Supp. at 185. The transcript of Harrington's testimony on which this finding was based reads as follows:

Q. As I understand your testimony, Mr. Harrington, the Murchisons indicated to you that they would like you to stay on the Board until the time they could arrange to take you out as a stockholder, is that correct?

A. As a director, you mean? No, it wasn't tied together. The principal thing that I knew to do was to get rid of my stock, and also not to be a director, because I don't like to be a director of something I don't have a substantial interest in.

. . . .

Q. While you were talking to Mr. John Murchison was a mention made of the fact that he thought the time had come where it would be appropriate for you to resign as a director of Alleghany Corporation?

A. No, sir. He did not suggest it at all. That was my idea.

12. We do note in this regard that the negotiated price of $12.19 per share was not significantly distant from Mr. Allen's upper range of net asset value, *i. e.*, $12.

The second contention also finds no conclusive support in the record. While Murchison, in his testimony, admitted to having discussed with Gamble the possibility of one or two board seats opening up, he specifically denied having agreed to deliver any of the seats as a condition of the bargain. Gamble's testimony was to the same effect. Although again, in light of the stipulation on credibility, we think the District Court need not have gone beyond this testimony, it found on the basis of its review of the entire record that appellant had not established his claim against John Murchison, and attributed Murchison's purchase from Harrington to the fact that the two had long been allies.

2. *Sale of Offices and Control*

We have already disposed of the claim that either Harrington or John Murchison sold Harrington's directorship to Gamble. Of the remaining nine Murchison directors, only one, Kimball, resigned his position following the sale to Gamble. The other eight continued to serve actively on the Board for fourteen months until they were replaced by the Kirby slate in December, 1963. The evidence is that Gamble, in his negotiations with John Murchison, suggested that he would like to have board representation in the event he acquired a significant amount of Alleghany stock. The Murchisons had already indicated their willingness to act upon their conviction that any large stockholder should have board representation, by offering two seats on the board to Kirby immediately after winning control from him. Consistent with this position, John Murchison responded to Gamble by saying that there was a possibility that two board seats might become vacant in the near future and that, if so, he would recommend Gamble and his attorney for election to the board.

■ The record indicates that Gamble signified an interest in additional representation, but was told by Murchison that "any further changes would have to take place in the course of the normal corporate procedure of the stockholders' meeting." The record further establishes that the price of $10 per share had been fixed upon before the question of board representation came up. Under these circumstances, we cannot fault the District Court for finding that there was no sale of these directorships as part of the Murchison-Gamble agreement.

The only other defendant to have resigned any position with Alleghany was John Murchison, who resigned the office of president in December, 1962. On the basis of Gamble's testimony that his accession to that office was first mentioned to him the day before the Board meeting on December 12, 1962—several months after the stock sale agreement had been reached—and that he was reluctant to accept this office which, so the record shows, was largely without power or significance, and the testimony of others that this office carried with it little power, the District Court found— properly, we think—that this transfer was unrelated to the original agreement.

■ The claim that the Murchisons sold management control of Alleghany is refuted by the simple fact that Gamble never acquired control. During the fourteen months between the agreement and the installation of the Kirby board, the Murchison group retained eight of the ten seats on the Board, continued to exercise firm control, and, indeed, rejected Gamble's position on a number of significant issues. In view of these facts, the District Court was amply justified in disallowing appellant's claim that the Murchisons sold control to Gamble.[13]

13. The District Court's conclusion, based on its independent review of the record, was the same as that drawn by the SEC on a virtually identical issue, *i. e.*, control within the meaning of § 2(a)(9). In the District Court, appellant relied on various statements by Gamble to Kirby and his representative that he, Gamble, was "in" and the Murchisons were "out". The SEC dismissed these as merely "overstatements made for bargaining purposes," and not significant in light of the fact

■ Indeed, appellant seems to have abandoned on appeal the claim that control was sold to Gamble, and relies primarily on the alternative theory argued to the District Court, namely, that the sale to Gamble was part of a larger conspiracy between the Murchisons, Gamble, and Kirby to retransfer control to Kirby. As the court pointed out, however:

> The difficulty with the argument is that the price to be paid to the Murchison group was fixed long before Kirby agreed to buy Gamble's stock and option contract. 335 F.Supp. at 291.

While we might agree with appellant's broad proposition that the use of an intermediary between two parties desiring to transfer corporate control cannot legitimize the transaction, there is no evidence in this case that Gamble was merely a conduit or that the Murchisons' sale to him was pursuant to a secret agreement with Kirby to transfer ultimate control to the latter. No authority has been cited for the broader contention that Kirby's participation *vel non* in the original agreement is irrelevant to the question of the Murchisons' culpability; and it is without merit.

The other allegations founded upon state law in the last analysis stand or fall on appellant's ability to establish the sale of office or control at a premium. Thus, as a parallel to his federal claim under Section 10(b), appellant claims that appellees used material inside information to their profit in violation of the principles established in Diamond v. Oreamuno, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969). In that case the defendant officers and directors of a corporation were privy to the information that corporate earnings had declined 75 per cent, and sold a large block of shares before the information became known to the public in general and their

buyers in particular. The court held that these practices, which clearly gave rise to an action by the buyers under federal law, also established a right to recovery of the profits by the corporation under state law.

This rule clearly has no application to the facts of the present case. In the first place, we are aware of no authority for the proposition that an offer to buy shares from a stockholder is either material inside information or a corporate asset. Second, while facts which are likely to affect adversely the future of the corporation (such as the Murchisons' difficulties with Kirby) may be material information, the only circumstance in which appellees could have derived a "profit," in the *Diamond* sense, from withholding that information would have been a subsequent decline in the value of the stock they sold, which did not happen here. Finally, the wrong which formed the basis for the corporate recovery in *Diamond* was the defendants' deception of those who bought their stock. The wrong which is alleged in this case, on the other hand, is the sale by appellees of their offices and corporate control.

Turning to the remaining claims, it is contended that in furtherance of their plan, appellees variously (1) committed fraud by issuing false and misleading proxy statements and other corporate reports, (2) breached an alleged contractual duty to serve as director for one full year, and (3) violated an alleged obligation under state law by postponing the 1963 annual meeting from April until December, 1963. Whether or not there is any legal or evidentiary basis for any of these assertions, it is plain that their only supposed injurious consequence was the facilitation or effectuation of the alleged plan to sell offices or control. Appellant's failure to demonstrate the basic injury renders academic

that Gamble never did obtain control. This court affirmed that conclusion. Phillips v. SEC, 388 F.2d 964 (2d Cir. 1968). On its own assessment of the record, the District Court agreed with the

SEC that Gamble "was aware of his tenuous status in the affairs of Alleghany," and rejected the claim that these statements demonstrated a change of control.

**1318**

the questions raised by these subsidiary claims.[14]

The judgment appealed from is affirmed.

14. The same is true of the fiduciary default alleged to reside in Alleghany's purchase of its own stock and shares of IDS and New York Central in the early part of 1962. This action was characterized by appellant as a device to further the plan to sell the Murchison holdings at a premium. It is not claimed that, apart from such a purpose, the transaction was either ill conceived or actually harmful to Alleghany.