369 F.3d 27
 ONTARIO PUBLIC SERVICE EMPLOYEES UNION PENSION TRUST FUND, Lead Plaintiff,
Eli Weinstein, on behalf of himself and all others similarly situated, M & G Investment Management Limited and Axa Investment Managers U.K. Ltd., Plaintiffs,
Peter S. Visnic, Michael Grynberg, Leroy Hibbitts, Said Kaleem and Philip Weisburgh Ira, Plaintiffs-Appellants,
v.
NORTEL NETWORKS CORPORATION, John Andrew Roth, William F. Connor, Chahram Bolouri and Frank Dunn, Defendants-Appellants.
 Docket No. 03-7608.
 United States Court of Appeals, Second Circuit.
 Argued: November 19, 2003.
 Decided: May 19, 2004.
 
 Dennis J. Johnson, Johnson & Perkison (Jacob B. Perkison and James P. Bonner, Shalov Stone & Bonner LLP, New York, NY, on the brief), South Burlington, VT, for Plaintiffs-Appellants.
 Stuart J. Baskin, Shearman & Sterling LLP (Tai H. Park, on the brief), New York, NY, for Defendants-Appellees.
 Before: OAKES, POOLER, and WESLEY, Circuit Judges.
 POOLER, Circuit Judge.
 
 
 1
 This case requires us to decide whether an individual has standing to sue a company pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, for making a material misstatement when the individual purchased the security of a company other than the one that made the misstatement. Plaintiffs Peter S. Visnic, Michael Grynberg, Leroy Hibbits, Sajid Kaleem and Philip Weisburgh IRA appeal from the May 14, 2003, judgment of the United States District Court for the Southern District of New York (Richard M. Berman, Judge), dismissing their complaint with prejudice, pursuant to Fed.R.Civ.P. 12(b)(6). We hold that plaintiffs lack standing under these circumstances and affirm.
 
 BACKGROUND
 
 2
 This is an appeal from a dismissal pursuant to Fed.R.Civ.P. 12(b)(6). The facts that follow are not disputed or are taken from the complaint. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Nortel Networks Corporation ("Nortel") is a global supplier of telecommunications services while JDS Uniphase Corporation ("JDS") manufactures and supplies fiber optic components. Nortel and JDS had been involved in a number of business relationships, and in January, 2001, Nortel was JDS's largest customer, accounting for 10-15% of JDS's revenues. Both companies are publicly traded and, while they appear to have maintained a healthy business relationship, nothing in the record indicates that the companies shared any management structures.
 
 
 3
 On January 16, 2001, market analysts and news agencies began reporting that Nortel and JDS were on the verge of consummating a transaction that would transfer JDS's laser business to Nortel, in exchange for Nortel stock. On February 6, 2001, Nortel and JDS confirmed that JDS was selling their laser business to Nortel in exchange for $2.5 billion in Nortel stock and a promise of increased fiber optic component purchases. This announcement, plaintiffs contend, caused the price of JDS shares to increase, as market analysts determined that this transaction would make it more likely that JDS would meet its 2001 financial projections. On February 12, 2001, the transaction closed, and Nortel filed a Form 8-K with the SEC, informing the public that it had completed the deal for $2.5 billion in stock.
 
 
 4
 Meanwhile, from January 18, 2001, to February 15, 2001, Nortel publically indicated that it saw strong demand for its fiber optics products and expected 30% growth in revenue and earnings for 2001. Plaintiffs claim that these assertions not only improved the value of Nortel's stock, but that because JDS made optimistic projections for its own business based on Nortel's claims, JDS's stock price reacted positively as well. However, on February 15, 2001, Nortel announced that it was cutting revenue estimates for the quarter by $1.7 billion and that revenue growth would be closer to 15% than 30%. Following this announcement, the value of both Nortel and JDS shares tumbled in heavy trading.
 
 
 5
 Plaintiffs allege that Nortel had known since at least the third quarter of 2000 that the demand for its products was falling and that it had booked revenue from 2001 during the third and fourth quarters of 2000 in order to meet analyst expectations for 2000. The need to resort to these radical tactics in 2000 did not prevent Nortel from setting lofty goals for 2001 and making representations that the demand for its products was growing. Thus, plaintiffs contend that all of the financial filings and press releases regarding earnings made by Nortel from January 18, 2001, to February 15, 2001, were materially misleading because they incorporated inaccurate accounting results and unfounded projections.
 
 District Court Proceedings
 
 6
 After the dust from Nortel's revenue adjustment settled, a number of Nortel shareholders filed class action lawsuits against the company pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5. These lawsuits were consolidated into a single class action lawsuit (the "Nortel Complaint"). In addition, several JDS shareholders filed a class action complaint against Nortel under the same securities laws (the "JDS Complaint"). The JDS Complaint was routed to the judge handling the Nortel Complaint, who consolidated the two actions for motion practice and discovery only.
 
 
 7
 On April 1, 2002, Nortel moved to dismiss the JDS Complaint for lack of standing pursuant to Fed.R.Civ.P. 12(b)(6).[1] After briefing, on January 3, 2003, the district court granted Nortel's motion. Citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) and Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.1952), the court held that the JDS shareholders did not have standing because they did not purchase or sell any Nortel stock. In addition, the district court concluded that plaintiffs did not satisfy the "in connection with" requirement of Section 10(b) and Rule 10b-5 as Nortel's statements concerned only its own financial state, not that of JDS.
 
 
 8
 On May 14, 2003, the district court entered a Final Judgment Order, dismissing the JDS Complaint with prejudice. Plaintiffs now appeal.
 
 DISCUSSION
 
 9
 This Court reviews de novo a district court's Rule 12(b)(6) dismissal of a complaint. Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir.2000). In doing so, we must "[accept] all factual allegations in the complaint as true and [draw] all reasonable inferences in the plaintiffs' favor." Id.
 
 
 10
 Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., provides that:
 
 
 11
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 12
 15 U.S.C. § 78j.
 
 
 13
 In accordance with this mandate, the U.S. Securities and Exchange Commission (the "SEC") adopted a number of rules, most notably Rule 10b-5. 17 C.F.R. § 240.10b-5. Rule 10b-5 provides that it is unlawful "(a) [t]o employ any device, scheme or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Id.
 
 
 14
 The language of Section 10(b) and Rule 10b-5 does not explicitly create a private right of action. In fact, the legislative history fails to indicate whether Congress even contemplated creating such a right. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 729-30, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (citing Note, Implied Liability Under the Securities Exchange Act, 61 Harv.L.Rev. 858, 861 (1948); A. BROMBERG, SECURITIES LAW: FRAUD — SEC RULE 10b-5 § 2.2(300)-(340) (1968); S. Rep. No.792, 73d Cong., 2d Sess., 5-6 (1934)). Nevertheless, courts long have held that a private right of action was indeed created. See e.g., Kardon v. National Gypsum Co., 69 F.Supp. 512, 514 (E.D.Pa.1946), Superintendent of Ins. v. Banker's Life & Cas. Co., 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). This understanding of Congress' intent supports the conclusion that private enforcement of SEC rules "[provides] a necessary supplement to Commission action." J.I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).
 
 
 15
 However, the private right of action is not unlimited. The Supreme Court has explained that "[w]hen we deal with private actions under Rule 10b-5, we deal with a judicial oak which has grown from little more than a legislative acorn.... It is therefore proper that we consider, in addition to the factors already discussed, what may be described as policy considerations when we come to flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance." Blue Chip Stamps, 421 U.S. at 737, 95 S.Ct. 1917. While courts were quick to recognize a private right of action under Rule 10b-5, they were equally quick to set limits on it. Indeed, our court was one of the first to restrict Rule 10b-5's private right of action. In Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.1952), a group of Newport Steel shareholders tried to bring suit against their company and its directors pursuant to Rule 10b-5. Id. at 462. They complained that one of the directors, who also held a controlling 40% interest in Newport Steel, had broken off merger talks with another steel company and had instead sold his stock to a third steel company in order to realize a control premium. Id. In explaining the transaction to the other shareholders, he told them that merger talks had broken down because of the "uncertain international situation." Id. They claimed that this misrepresentation, along with the director's sale of securities was enough to trigger liability under Rule 10b-5. Id. We found no standing, holding that Rule 10b-5 "was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities" thus limited the class of plaintiffs who could make use of the Rule. Id. at 464.
 
 
 16
 This restrictive view of standing under Rule 10b-5 was confirmed by the Supreme Court in Blue Chip Stamps. In that case, the Supreme Court held that individuals who failed to purchase a stock due to a company's misrepresentation of the value of its stock did not have standing to sue under Rule 10b-5 because they were not purchasers or sellers of the security. Id. at 754-55, 95 S.Ct. 1917.
 
 
 17
 In reaching its conclusion, the Court relied heavily on an analysis of congressional intent. Specifically, the Court found that Section 10(b)(5) of the Exchange Act served the same goal as the Securities Act of 1933, 15 U.S.C. § 77a et seq., which was passed in order to prevent companies from using high pressure sales tactics to intimidate people into buying their securities. Id. at 752-53, 95 S.Ct. 1917. The Court reasoned that this intent was not furthered by allowing a cause of action for people who did not buy the securities. Id. at 754, 95 S.Ct. 1917.
 
 
 18
 The Court also noted that "[t]here has been widespread recognition that litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." Id. at 739, 95 S.Ct. 1917. Thus, allowing a cause of action for non-purchasers would lead to an unacceptable level of abusive litigation. This problem of abusive litigation was particularly salient in the securities litigation field because actions by non-purchasers brought under Rule 10b-5 rely heavily on oral testimony, making them extremely unpredictable until they reach a jury.[2] Id. at 739-745, 95 S.Ct. 1917. Thus, the Court was concerned companies could be forced to settle cases that were not meritorious in order to manage their risk-levels. Id.
 
 
 19
 In this case, plaintiffs are quick to point out that they did purchase securities after the alleged misrepresentations took place. However, instead of purchasing securities of the entity that made the alleged misrepresentations, they purchased securities of a company that had a business relationship with the misrepresenter. They claim that they have met the Blue Chip Stamps standing requirements because they purchased the security at issue in their lawsuit. They base this argument on the references in Section 10(b) and Rule 10b-5 to fraudulent conduct "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b) (emphasis added), 17 C.F.R. § 240.10b-5 (emphasis added). In plaintiffs' view, the word "any" indicates that the intent of Congress and the SEC was to create universal standing for purchasers of securities, allowing anyone who made use of the markets to sue under Rule 10b-5. They further argue that this interpretation is consistent with the Supreme Court's understanding that Congress intended Section 10(b) to be interpreted flexibly to protect against the ever-evolving nature of securities fraud. Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).
 
 
 20
 Plaintiffs assume that the phrase "any security" includes securities of any company affected in some way by the misrepresentation and not just securities of the company that makes the material misstatements. However, in our view, the phrase indicates that the regulations reach all types of securities, and not any affected company's securities. See THOMAS LEE HAZEN, THE LAW OF SECURITIES REGULATION § 12.4 (4th ed.2002) (explaining that Rule 10b-5's "any security" language means that it applies to all types of securities, even those that are exempt from registration). Furthermore, plaintiffs' interpretation of this passage is entirely at odds with the purchaser-seller requirement in Blue Chip Stamps that "limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." Blue Chip Stamps, 421 U.S. at 747, 95 S.Ct. 1917.
 
 
 21
 Plaintiffs attempt to salvage their case by arguing that Blue Chip Stamps merely holds that an individual who does not purchase securities cannot sue under Section 10(b) and Rule 10b-5. They contend that Blue Chip Stamps has no bearing on the facts of this case, as plaintiffs did purchase securities. While plaintiffs correctly identify the factual context of Blue Chip Stamps, the Court's reasoning is nonetheless valuable in analyzing plaintiffs' claim. First, in Blue Chip Stamps the Court embraced the Birnbaum standing limitations as compatible with the legislative intent of the Exchange Act. Blue Chip Stamps, 421 U.S. at 733-34, 95 S.Ct. 1917. The Supreme Court's adoption of Birnbaum is particularly significant because, like the plaintiffs in our case, the plaintiffs in Birnbaum attempted to stretch the meaning of Rule 10b-5. Birnbaum, 193 F.2d at 462. We rejected that view of the statute, and the Supreme Court agreed with our narrow interpretation.
 
 
 22
 Furthermore, in this case, as in Blue Chip Stamps, to allow plaintiffs standing would encourage individuals to engage in potentially abusive litigation. This concern was based in part on the fact that an individual's claim that he did not purchase a security would rest almost exclusively on oral testimony. Blue Chip Stamps, 421 U.S. at 743, 95 S.Ct. 1917. Because oral testimony cannot be adequately evaluated until presented to a jury, the Court wanted to protect companies from having to defend and settle cases that relied heavily on that form of evidence. As the Court noted, "the abolition of the Birnbaum rule would throw open to the trier of fact many rather hazy issues of historical fact the proof of which depended almost entirely on oral testimony." Id. Here, oral testimony would play a crucial role in proving that plaintiffs relied on Nortel's financial projections when they purchased JDS's securities. In a case where the plaintiff is bringing an action against the company whose securities he purchased, this testimony is corroborated by his ownership of the company's securities. However, where a plaintiff is bringing an action based on the statements of a company whose securities he did not purchase, "[p]laintiff's entire testimony could be dependent upon uncorroborated oral evidence of many of the crucial elements of his claims and still be sufficient to go to the jury." Id. at 746, 95 S.Ct. 1917.
 
 
 23
 Plaintiffs' also rely on Semerenko v. Cendant Corp., a Third Circuit case. 223 F.3d 165 (3d Cir.2000). In Cendant, the American International Group, Inc. ("AIG") and Cendant Corp. ("Cendant") entered into a bidding war to claim majority control over American Bankers Insurance Group, Inc. ("ABI"). Id. at 170. AIG initiated the bidding, but Cendant eventually won the war. Id. However, before the transaction could be finalized, Cendant announced that it had uncovered some accounting irregularities that would force it to restate its earnings. Id. Cendant initially tried to honor its bid for ABI, but as details of its accounting problems surfaced, Cendant eventually withdrew from the transaction. Id. at 171. As soon as Cendant cancelled the merger, individuals who had purchased shares of ABI after AIG put the company in play with its initial tender offer filed a 10b-5 class action complaint, alleging that Cendant's misstatement of its financial condition caused the price of the ABI stock they purchased to fall.
 
 
 24
 The Cendant court remanded the case to the district court to determine whether the "in connection with" requirement of Rule 10b-5 had been met. Id. at 177-78. Plaintiffs argue that by reaching the "in connection with" requirement, the Cendant court implicitly held that the plaintiffs had standing to bring their Rule 10b-5 action. However, the opinion never explicitly addressed the standing requirement of Rule 10b-5, and this limits its persuasiveness. It is unclear whether the Cendant court even considered the standing question and it is unreasonable to assume that the court believed standing to be so clearly established that it did not even warrant discussion in the opinion. Thus, while we take notice of the result in Cendant, we do not agree with the plaintiffs that it presents a compelling argument in favor of standing.
 
 
 25
 Furthermore, Cendant is easily distinguishable. In Cendant, the purchasers of ABI stock understood that it would be exchanged for another company's stock, and the later purchasers thought that it would be exchanged for Cendant stock. This understanding created a direct link between the value of Cendant's stock and ABI's stock that is not present in this case. Furthermore, because Cendant was in the process of merging with ABI, its representations had a much more direct relationship to the value of ABI's stock than Nortel's statements did to the value of JDS's stock, given that no merger was contemplated between these two companies. While there is a multi-billion dollar transaction involved in both cases, a merger creates a far more significant relationship between two companies than does the sale of a business unit. Thus, while a potential merger might require a different outcome, a question that we leave for another day and about which we express no opinion, what remains clear is that the plaintiffs in this case do not have the necessary standing to proceed in an action under Section 10(b) and Rule 10b-5.
 
 
 26
 Finally, the district court, in finding that the plaintiffs lacked standing, appeared to conflate the issue of standing with the question of whether the "in connection with" requirement had been met. This is misleading because these are two distinct inquiries. In order for our court to properly reach the merits of the case, including the "in connection with" requirement, we must first find that the parties involved have met the basic requirements of standing. See Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Thus, because we find that the plaintiffs lack standing under Section 10(b), we do not reach the "in connection with" requirement.
 
 CONCLUSION
 
 27
 Stockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase. Therefore, we affirm the district court's dismissal of plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(6).
 
 
 
 Notes:
 
 
 [1]
 Nortel also moved to dismiss both the JDS Complaint and Nortel Complaint on the basis that neither adequately alleged that Nortel made any actionable misstatements of material fact, or that Nortel acted with the requisite scienter. The district court held that the Nortel Complaint satisfied these requirements and dismissed the JDS Complaint on other grounds
 
 
 [2]
 While the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67, 109 Stat. 737 (1995) (codified in scattered sections of titles 15 and 18 of the United States Code), was enacted to further limit the problem of potentially abusive securities litigation, it did so without affecting the Court's holding inBlue Chip Stamps.