**Edward J. WILSMANN,**
**Plaintiff-Appellant,**
**Cross-Appellee,**

v.

**UPJOHN CO. and Upjohn Health Care Services, Inc., Defendant-Appellee, Cross-Appellant.**

**Nos. 84–1333, 84–1334.**

United States Court of Appeals, Sixth Circuit.

Argued April 9, 1985.

Decided Oct. 24, 1985.

Rehearing and Rehearing En Banc Denied Jan 20, 1986.

---

Richard C. Walsh argued, Walsh, Miller, Rayman & Langeland, Kalamazoo, Mich., for appellant cross appellee.

Rosalind C. Cohen argued, Asst. General Counsel, Jacob H. Stillman, Washington, D.C., amicus curiae counsel.

Thomas G. Parachini, Dirk J. Holkeboer-Lead Counsel Miller, Canfield, Paddock & Stone, Kalamazoo, Mich., Charles Lister, argued, Washington, D.C., for appellee cross appellant.

Before JONES and WELLFORD, Circuit Judges; and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

In this case, which arises out of the merger of Homemakers, Inc. with the Upjohn Company (Upjohn), the jury found that Upjohn violated section 10(b) of the Securities Exchange Act of 1934 ('34 Act), 15 U.S.C. § 78j (1981), and the Securities and Exchange Commission's (SEC) Rule 10b-5, 17 C.F.R. § 240.10b-5 (1985), and awarded plaintiff Wilsmann, Homemakers' president and a stockholder, $1,578,107.00

in damages.[1] 583 F.Supp. 1060. Both Wilsmann and Upjohn have appealed.

## I

In 1969, appellant Wilsmann and two other men, Campbell[2] and Wunderlich, were the only shareholders of Homemakers, Inc.,[3] a small Illinois corporation that sold home health care franchises.[4] Wilsmann served as Homemakers' president and chief executive officer, and Campbell served as marketing director. In 1969, Homemakers, in need of working capital, entered into merger negotiations. In June of 1969, Homemakers decided to merge with Unicare, Inc., a corporation that operated a number of nursing homes. As part of the proposed merger, Unicare loaned $260,000 to Homemakers. Before the merger with Unicare was completed, however, Wilsmann learned that Upjohn might be interested in acquiring Homemakers. Wilsmann then stalled its merger with Unicare and entered into negotiations with Upjohn.

After several meetings and discussions, Homemakers and Upjohn tentatively

---

1. These sections provide in pertinent part:

   15 U.S.C. § 78j. Manipulative and deceptive devices

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   . . .

   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

   § 240.10b-5. Employment of manipulative and deceptive devices

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.

   (a) To employ any device, scheme, or artifice to defraud,

   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading, or

   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

   in connection with the purchase or sale of any security.

2. The same district judge decided the related case of *Campbell v. Upjohn Co.,* 498 F.Supp. 722 (W.D.Mich.1980), *aff'd,* 676 F.2d 1122 (6th Cir. 1982). In *Campbell,* the plaintiff originally filed suit in the Connecticut state courts. The action was removed to the federal district court there and then transferred to the western district of Michigan. In *Campbell,* the district court held, and this court affirmed, that Campbell's claims of securities fraud were barred by the Connecticut statute of limitations.

3. In 1969, 91 Homemakers shares were issued and outstanding. Wilsmann owned 45 shares of Homemakers stock, Wunderlich owned 35 shares, and Campbell owned 11 shares. In addition, 20 debentures that were convertible into 20 shares of Homemakers common stock were owned by various persons not involved here.

4. Home health care includes the provision of temporary professional and paraprofessional nursing and housekeeping services in the home.

agreed to a merger in which a new Homemakers, to be formed under Delaware law, would become an Upjohn subsidiary via a stock-for-stock exchange. The proposed merger agreement was reduced to a letter of intent prepared by Upjohn on June 19, 1969 which Wilsmann signed for Homemakers. It expressly did not bind either side. Under the terms of this letter of intent, Upjohn would exchange 225 shares of its stock for each share of Homemakers,[5] and Upjohn also would redeem the debentures at $12,500 each. This letter of intent also provided that at the conclusion of the acquisition, Wilsmann and Campbell each would have a 5.4 percent stock interest in the new Homemakers subsidiary.[6] In addition, this letter of intent provided that Upjohn would have an option to purchase these 5.4 percent stock interests at the end of five years for an amount equal to twenty times the average annual earnings per share of new Homemakers over the preceding five years. It was contemplated that both Wilsmann and Campbell would become key employees of the new Homemakers and that its profits would be greatly affected by their performance. Wunderlich would not retain any interest in the new corporation.

Although the letter of intent clearly provided that Upjohn would have an *option* to purchase Wilsmann's and Campbell's shares in new Homemakers *for a price based on earnings*, Wilsmann contends that the actual agreement was dramatically different. According to Wilsmann, Upjohn officials at that time orally promised that Wilsmann and Campbell, but not Wunderlich, in order that Wilsmann and Campbell would receive the "true value" of all of their old Homemakers stock, be paid a "back end" payment of Upjohn stock in exchange for their new Homemakers stock equal to the *total* "front end" payment of Upjohn stock distributed to all three. Specifically, Wilsmann contends that Upjohn orally promised that he and Campbell would receive a total of 17,775 shares[7] of Upjohn stock tax free at the end of five years in exchange for their 5.4 percent interests in new Homemakers to be divided equally. App. 285–86. Wilsmann contends that this "back end" payment was reflected in the letter of intent, not as we have just described and as the parties had orally agreed, but as the five year "earn out" by the option to purchase their new Homemakers stock for an amount based on its earnings. This "earn out" provision was placed in the letter of intent rather than the oral agreement, Wilsmann contends, because it was believed that Wunderlich, an elderly man and an investor, had not contributed anything to Homemakers except his small initial investment and therefore should not be a minority stockholder in new Homemakers and not participate in the "back end" payment. Wilsmann contends that, by incorporating the "back end" payment in the letter of intent as an "earn out" for him and Campbell, Wunderlich would be prevented from obtaining any interest in the new Homemakers subsidiary and receiving any part of the "back end" payment of Upjohn stock to be distributed under the oral agreement. Wilsmann contends that Upjohn understood and indeed promoted this subterfuge.[8]

---

5. Upjohn stock was then valued at approximately $45 per share. Thus Upjohn stock worth $10,125 ($225 \times \$45$) would be exchanged for each share of old Homemakers stock.

6. Although not specifically set out in the June 19, 1969, letter of intent, it is agreed that it was mutually understood that Wilsmann and Campbell would each surrender six of their old Homemakers shares, not for Upjohn stock, but for a 5.4% interest in the new Homemakers to be formed.

7. The computation, *per* Wilsmann, was as follows: 91 issued shares of old Homemakers, less the 12 old Homemakers shares to be surrendered for new Homemakers shares by Wilsmann and Campbell, multiplied by 225, the "front end" exchange rate for Upjohn/Homemakers stock, $91{-}12 = 79 \times 225 = 17,775$.

8. If, as Wilsmann contends, Wilsmann and Campbell were to receive the back end payment of Upjohn stock in order that they receive the "true value" of their interests in old Homemakers, it is difficult to see why Campbell would receive half of these Upjohn shares. It is, moreover, difficult to see why, if the purpose of this

Under the terms of the letter of intent, as stated, Upjohn would have an option to acquire the interest of Wilsmann and Campbell in new Homemakers in 1975 for an amount based on earnings. Wilsmann claims that he expressed concern about the possibility that the subsidiary would not have any or sufficient earnings during the first five years, and Wilsmann maintains that an Upjohn official promised him that Upjohn would not exercise its option to exchange Upjohn shares for his interest in new Homemakers until a "back end" value equivalent to the "front end" had been achieved. App. 286.[9]

In addition to signing the letter of intent, on June 19, 1969, Upjohn loaned old Homemakers $264,550 to keep afloat, that is, to repay the Unicare loan and $25,000 to provide Homemakers with some working capital. Wilsmann admitted that old Homemakers was "broke" at that time, as indeed it was. App. 293. In return for the loan, Upjohn received promissory notes from old Homemakers, and Wilsmann and Campbell pledged their old Homemakers stock to Upjohn.

A second letter of intent, which also expressly did not bind either side, was prepared and signed by the parties on August 11, 1969, because the loan from Upjohn to old Homemakers, Upjohn learned, necessitated a restructuring of the terms of the merger for tax purposes.[10] Like the June 19, 1969, letter of intent, the second letter of intent provided that Upjohn would merge with old Homemakers in a stock-for-stock exchange in which the old Homemakers shareholders would receive 225 Upjohn shares in return for each of their Homemakers shares. The second letter differed from the first in that *all* old Homemakers shares would be exchanged in the merger, and Wilsmann and Campbell would have no stock interest in the new Homemakers subsidiary. The exchange rate would be the same, i.e. 225 Upjohn shares for each share of old Homemakers stock. The second letter of intent further provided that at the conclusion of the merger, Wilsmann and Campbell would have entered into five year incentive employment agreements with Upjohn that provided for an annual bonus for each man equal to 21.6 percent of the after tax operating and prebonus earnings of the Homemakers subsidiary less $12,150.[11] Thereafter several drafts of a merger agreement were prepared, and the closing occurred on November 6, 1969. The final merger agreement, dated October 31, 1969, which contained the same provision for exchange of all old Homemakers stock for Upjohn stock as that contained in the second (August, 1969) letter of intent, and which also made reference to the employment agreements, contained an integration clause superseding and nullifying all other agreements to the contrary.

At the time of the closing, Upjohn presented Wilsmann but not Campbell[12]

subterfuge was only to mislead Wunderlich, Wilsmann did not insist that this oral agreement, inconsistent with the letter of intent, be placed in writing in a side agreement. (Wilsmann was no neophyte, being a certified public accountant and having an M.B.A. degree from Northwestern University. He was 45 years of age at that time.) It goes without saying that, whether or not Wunderlich "deserved" to participate in the back end distribution of Upjohn stock, he, as the owner of old Homemakers stock, was legally entitled to the same rate of payment therefor as Wilsmann and Campbell.

9. This version of the oral side agreement, it should be noted, is somewhat different from that which Wilsmann apparently relies on in this litigation.

10. There is no dispute that, because of the loan by Upjohn to old Homemakers, the acquisition, as contemplated by the June, 1969 letter of intent, would not be tax free. The first plan of merger is referred to in the record as a "Type B" merger; the second plan is referred to as a "Type A" merger.

11. Upjohn contends that this bonus arrangement set out in the August, 1969 letter of intent was an attempt to approximately replicate, with respect to money to be received by Wilsmann and Campbell, the prior arrangement whereby Upjohn would have had the option to purchase their stock in new Homemakers at a price based on profits.

12. Campbell was not hired because he misrepresented his educational achievements. Campbell claims that immediately before the closing, Upjohn officials confronted him regarding the misrepresentations in his resume and told him that

with a separate employment agreement. Wilsmann's employment agreement, which also contained an integration clause, provided that Wilsmann would be employed by new Homemakers as president from the date of the merger until November 30, 1974. The agreement further provided that if neither new Homemakers nor Wilsmann gave the other written notice of a desire to terminate the agreement thirty days prior to the expiration of the five year period, then the agreement would continue in effect until either gave the other thirty days notice of termination. Under the terms of the agreement, Wilsmann would receive a basic annual salary of not less than $40,000. The agreement also provided a bonus payment for Wilsmann based on profits in substantially the same terms as those contained in the second (August, 1969) letter of intent.[13]

Although the second letter of intent and the formal merger document and employment agreement provided that Wilsmann was to receive Upjohn stock for his old Homemakers stock and was to receive a bonus for the first five years based on profits, Wilsmann contends, again, that the oral agreement was dramatically different. He agrees that he was to receive, as he did receive, 225 shares of Upjohn stock for each of his forty-five old Homemakers shares, a total of 10,125 shares, of a value of $455,625.[14] (Parenthetically, Upjohn shares split two for one in 1973 so Wilsmann then had 20,250 shares worth approximately $104 per share or a total of about $2,106,000. App. 419.) He contends, however, that as a "back end" payment under the oral agreement he and Campbell were together to receive, in cash, at the end of the five years an amount equal to the 1969 value of 17,775 shares of Upjohn stock or $799,875. This, however, Wilsmann contends, was to be the minimum; if the bonus formula called for a larger amount, they were to receive that. He further contends that since, under the original oral understanding, he and Campbell were to receive the 17,775 shares tax free, they would receive the $799,875 tax free— that is, enough would be added to pay the

---

he could either resign from Homemakers before the merger or that he would be fired immediately after the merger. Campbell testified that he was so humiliated by Upjohn's actions that he signed a letter of resignation and the merger agreement without reading them. 676 F.2d at 1125.

**13.** The compensation provision in the employment agreement provided as follows:

> 3. *Compensation*
>
> As compensation for the services and duties to be rendered by Wilsmann hereunder, Homemakers agrees to pay Wilsmann as follows:
>
> (a) A basic salary of not less than $40,000 per annum, payable in equal monthly installments; plus
>
> (b) In the event the earnings of Homemakers are sufficient as hereinafter set forth, a bonus shall be paid to Wilsmann for each of the five twelve-month periods commencing December 1, 1969, in an amount by which 21.6% of the Net Earnings of Homemakers exceeds $12,-150. The said bonus, if due, shall be payable on the first day of the month of July following the expiration of the twelve-month period for which a bonus is due.
>
> (c) "Net Earnings" of Homemakers shall mean the Net Earnings after taxes of Homemakers or the appropriate portion of the Net Earnings after taxes of any corporation into which Homemakers shall have been merged or with which it shall have been consolidated for the filing of tax returns or to which it shall have sold all or substantially all of its assets, determined in accordance with generally accepted accounting principles promulgated by the American Institute of Certified Public Accountants, Inc., applied in accordance with Upjohn's accounting practices, adjusted as follows:
>
> (i) Eliminate the tax effect of any prior year's losses.
>
> (ii) Eliminate the amount of the bonus, net of the income tax benefits applicable thereto, to be paid to Wilsmann pursuant to this Agreement.
>
> In computing Net Earnings, interest on any loans made by Upjohn or any subsidiary of Homemakers shall be at a rate not in excess of 1% over the then applicable prime rate for preferred customers of First National City Bank, New York, New York.
>
> (d) Wilsmann shall be entitled to the customary employee benefits of Homemakers during the term of this Agreement.

**14.** It appears that, though for purposes of the merger Upjohn stock was given its June, 1969 value of $45 per share, by the time of the merger it was actually worth $48 per share so that Wilsmann received stock worth $486,000.

income taxes on such payment. Of course, as heretofore stated, Campbell was not hired, but Wilsmann contends that since, in 1973, Upjohn stock split two for one, he alone should have received at the end of five years the cash equivalent as of 1969 of 17,775 shares or $799,875. App. 310–15.

Under the terms of the second letter of intent, the merger document and the employment agreement, as stated, Wilsmann would be entitled for five years to a bonus based upon earnings and in accordance with a prescribed formula. Wilsmann contends that he "expressed concern that he would not receive 'true value' under the written terms of the merger and employment contract, but plaintiff was assured by The Upjohn Company that said contract would be extended until he received true value." App. 17.[15]

On July 31, 1974, in accordance with the terms of the employment agreement, Upjohn told Wilsmann that his employment contract with Homemakers would not be extended beyond December 31, 1974, but that he was performing satisfactorily and would be continued as an employee. Wilsmann remained an employee as Homemakers' president until he was fired on December 17, 1976, for alleged insubordination. During the five years in which the bonus provision was in effect, according to Upjohn's accountants, the Homemakers subsidiary incurred substantial losses. Upjohn, therefore, informed Wilsmann from time to time that he was not entitled to any employment bonuses.

## II

Wilsmann filed an action against Upjohn and Homemakers on June 27, 1977. The complaint contained several counts, including an antitrust count, but for present purposes it is only necessary to relate that he alleged fraud in violation of the Securities and Exchange Act (15 U.S.C. § 78j and Rule 10b–5 (17 C.F.R. § 240.10b–5)) promulgated thereunder and a claim under state law for breach of contract. The case was tried to a jury, and issues were submitted with respect to fraud under the federal statute and regulation and breach of contract under state law. The jury was instructed to consider the state law claim only if it found for the defendants on the federal law claim. The jury found for Wilsmann on the federal law claim, awarding him damages in the amount of $1,578,107. Accordingly, it did not render a verdict on the state law breach of contract claim. On motion for Wilsmann, the district court ordered payment of prejudgment interest of $970,000. The district court then denied defendants' motion for a new trial and judgment n.o.v. Both sides have appealed.

Wilsmann contends that the district court erred in its decision that Wilsmann, by arguing to the jury for money damages, had thereby made an election that barred his claim for rescission or rescissional damages. Wilsmann further contends that the district court erred in its charge to the jury on the measure of damages. Finally, Wilsmann contends that the district court erred in denying his motion to amend the complaint to allege common law fraud and for wrongful discharge under the doctrine of *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980).

Upjohn and Homemakers assert that the district court erred in not granting their motion for a judgment n.o.v. on the ground that Wilsmann's claim was not properly within the scope of the federal securities laws. They further assert that the motion for a judgment n.o.v. should have been granted on the ground that, in the light of the specific provisions in the documents executed by the parties, including the integration clauses, the position and background of the parties, and the essential implausibility of Wilsmann's contentions with respect to oral side agreements, a jury could not within reason find for Wilsmann as it did. Upjohn and Homemakers further contend that the district court erred in failing to instruct the jury with respect to the

---

**15.** This version of the second oral side agreement, it should be noted, is somewhat different from that which Wilsmann apparently relies on in this litigation.

applicable six year statute of limitations. Finally, Upjohn and Homemakers assert error in the refusal of the district court to receive evidence that the jury had actually awarded prejudgment interest as part of its verdict.

## III

Upjohn and Homemakers contended in the district court and contended here that the federal securities law and regulation upon which Wilsmann relied do not apply because the transaction involved was a sale of a business. Without citing the authorities, we can state that the circuits (other than this one, which has not taken a position) were divided on the issue of whether the federal securities law did apply to the sale of a business. Since then, however, the Supreme Court has decided that this federal law does apply to the sale of a business. *Landreth Timber Co. v. Landreth,* — U.S. —, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) and *Gould v. Ruefenacht,* — U.S. —, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985). Upjohn and Homemakers have conceded this point and therefore we need not deal further with it.

Upjohn and Homemakers also contend that the federal securities law does not apply here because, in economic reality. Wilsmann's complaint was that there was fraud involved in inducing him to enter into the employment contract and that there was a breach of such employment contract and that there is no fraud charged with respect to the Upjohn stock that Wilsmann received for his Homemakers stock.

On the contrary, Wilsmann's claim is that he sold his stock in old Homemakers to Upjohn for Upjohn stock and for promises made to him by Upjohn of cash and other benefits which Upjohn did not intend to keep; that is to say, he asserted a claim of promissory fraud with respect to his sale. Wilsmann's allegations as to promises by Upjohn that it did not intend to keep (some of which were heretofore set out) were these: that he would at the end of five years be paid an additional "back end" payment for his stock, that the bonus

period would be extended until the bonus paid would satisfy the "back end" obligation, that Upjohn detail men (pharmaceutical salesmen) in the field would be used to promote new Homemakers, that new Homemakers would incur no interest expense as a result of loans made to it by Upjohn, and that he would be employed for life.

In *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017 (6th Cir.1979), this court, holding that § 10b and Rule 10b–5 should be liberally construed to effectuate the policies of the Act (*id.* at 1024), stated:

> As a general matter, however, private § 10(b)/Rule 10b–5 damage claims can be said to require: 1) the use of jurisdictional means 2) to implement a deceptive or manipulative practice (with the requisite scienter) 3) in connection with 4) the purchase or sale 5) of a security 6) causing 7) damages.

*Id.* at 1026.

The question here is whether the thrust of Wilsmann's claim is promissory fraud "in connection with" the purchase of Wilsmann's shares in old Homemakers.

In *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), the Court (*per* Justice Douglas) held that the sale of securities involved there was covered by the federal securities laws because the seller "suffered an injury as a result of a deceptive practice *touching* its sale of securities as an investor." *Id.* at 12–13, 92 S.Ct. at 168–69 (emphasis added).

The case that perhaps comes closest to supporting Upjohn's contention is *Chemical Bank v. Arthur Andersen,* 726 F.2d 930 (2d Cir.1984), *cert. denied* — U.S. —, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). In that case, a company pledged the stock of a subsidiary to secure loans, and the contention was that officers and the accounting firm of the borrower made fraudulent misrepresentations as to the financial condition of the borrower. There was no fraud alleged, however, with respect to the stock of the subsidiary that was pledged.

The question presented was whether this claim based on fraud with respect to the financial condition of the borrower could be maintained under the federal securities laws. The Second Circuit (*per* Friendly, J.) agreed with the plaintiff banks that the pledge of the subsidiary's stock was a purchase and sale of the stock within the meaning of the federal statute and regulation. The court, however, disagreed with the banks that it was sufficient, for application of the federal statute and regulation, that *but for* the pledge of the stock of the subsidiary, the loans would not have been made and held that the federal securities laws were not applicable. Judge Friendly agreed with Professor Loss that Justice Douglas's use of "touching" in *Bankers Life* was nothing more than the Justice's variation of "in connection with" as a matter of literary style. *Id.* at 942.

■ The case before us, however, is clearly distinguishable from *Chemical Bank*. Here it is Wilsmann's contention and testimony that the consideration for the sale of his old Homemakers stock to Upjohn was not only the Upjohn stock then received but also the false promises by Upjohn as to what he would receive later for his old Homemakers stock. The *Chemical Bank* decision might be applicable here if Wilsmann's contention were that the Upjohn stock received upon the surrender of his old Homemakers stock was all that he was promised for his stock and that he would not have sold his old Homemakers stock to Upjohn *but* for a false promise of life employment with a bonus.

Accordingly, we determine that Wilsmann's claim on the basis of which he received a jury verdict could be prosecuted under the federal law and regulation upon which he relied.

## IV

As stated, Upjohn and Homemakers further contend that the district court erred in not granting a directed verdict and in not granting a judgment n.o.v. on the ground that there was not sufficient evidence to support a verdict based on alleged fraud and under the federal securities law and regulation.

■ We have concluded that Upjohn and Homemakers are correct in this contention. We believe that, even if there were enough evidence here to be pieced together to support a verdict on one of Wilsmann's theories as to Upjohn's alleged promises, Wilsmann's very theories as to the content of the promises to him were in conflict, with the result that the jury was left to sheer speculation. We will first deal with the problem created by the essential implausibility of Wilsmann's contentions and then demonstrate the conflict *inter se* in his testimony as to what the core agreement was between him and Upjohn.

As stated, in 1969 Wilsmann was forty-five years of age, a certified public accountant and held an M.B.A. degree from Northwestern. Although home health care was a valid concept, Homemakers was broke and could not go public for funds. It was absolutely necessary that Homemakers find funds to stay afloat, and a merger appeared to be the only course.

Under the terms of the first letter of intent of June, 1969, Wilsmann would, for his old Homemakers stock, get 8775 shares of Upjohn stock (39 × 225) worth $45 per share or $394,875. In addition, he would receive a 5.4 percent interest in new Homemakers, which shares Upjohn would have an option to purchase in five years at a price based on average earnings per share over five years. Wilsmann executed the letter of intent and did not contend that he did not understand it.

Nevertheless, Wilsmann contends that the foregoing was not the real understanding as to what he was to be paid for his 5.4 percent interest in new Homemakers. Wilsmann contends that, in order that he and Campbell would receive the "true value" of all their old Homemakers stock, in five years they would assuredly receive 17,775 shares of Upjohn stock to be divided equally. This figure was, according to Wilsmann, arrived at by multiplying the total number (91) of old Homemakers shares

outstanding, reduced by the twelve shares that he and Campbell would exchange for the new Homemakers stock (79), by 225. Thus their "back end" payment would in part be a payment for Wunderlich's stock. There is, however, no explanation as to why, if he and Campbell were to be paid the "true value" of their old Homemakers stock, Campbell would receive half of the 17,775 shares, and there is no apparent reason therefor since Wilsmann had forty-five shares and Campbell had only eleven. As a matter of fact, if Upjohn were obligated in five years, when Wilsmann and Campbell would surrender their 5.4 percent interest in new Homemakers, to pay them enough Upjohn stock to insure their receipt of the "true value" of their old Homemakers stock, there is no apparent reason why the formula should be reduced by the twelve shares to be surrendered for the 5.4 percent interest in new Homemakers so that the formula would have been 91 × 25 or 20,475 shares to be divided evenly by Wilsmann and Campbell.

Wilsmann contends that, under this June, 1969, oral side agreement, Wunderlich was to receive none of the "back end" payment of shares, and that the provision in the letter of intent for the option to purchase. Wilsmann's and Campbell's shares in new Homemakers for a price based on earnings was placed there to mislead Wunderlich. Wilsmann attributes this alleged chicanery to Upjohn, contending that Upjohn insisted that if this subterfuge were not employed, Upjohn would also have to make a "back end" payment of Upjohn shares to Wunderlich. Wilsmann never explains, however, why, if Upjohn was willing to make a "back end" payment of 17,775 shares, equal to the total "front end" payment, in five years to compensate for the "true value" of old Homemakers, Upjohn would object to Wunderlich's receiving his pro rata share of this distribution. Nor does Wilsmann explain why he did not insist that this oral side agreement, of such great importance to him, be memorialized by a written side

agreement. Apparently he considered asking Upjohn for what he called a "dresser drawer deal," i.e. a written side agreement, but did not do so. App. 295.[16]

Wilsmann had another version of this oral side agreement which in part recognized the provision in the June, 1969 letter of intent and is somewhat different from the version that called for the payment to Wilsmann and Campbell of 17,775 shares at the end of five years in any event. It will be remembered that under the letter of intent Upjohn would have an option to purchase Wilsmann's and Campbell's 5.4 percent interests in new Homemakers at the end of five years for a price based on earnings of new Homemakers. Wilsmann contends that he raised the question of what would happen if new Homemakers' earnings were deficient. He contends that Upjohn's response was that it would "not exercise [its] option until the true value is there." App. 286–87. Under this version, it appears that Upjohn would not have an unqualified obligation to deliver 17,775 shares at the end of five years, and, instead, it would defer exercise of its option until the earnings of new Homemakers under the formula would support a distribution of 17,775 shares of Upjohn stock to Wilsmann and Campbell.

The second letter of intent of August, 1969 provided that Wilsmann, Campbell and Wunderlich would each receive 225 shares of Upjohn stock for each of their old Homemakers shares and Wilsmann and Campbell would be employed by Upjohn on a salary and bonus arrangement. Neither Wilsmann nor Campbell would receive any shares in new Homemakers. These were the actual terms of the formal merger and employment documents executed in November, 1969. Wilsmann received at that time 10,125 (45 × 225) shares of Upjohn stock at $45 (or $455,625) which was actually by then at $48 per share or $486,000. Wilsmann's employment agreement explicitly set out precisely how his bonus based

---

**16.** It is noted that while Wilsmann attributes to Upjohn the claimed chicanery to cheat Wunderlich, Wilsmann, under his contention, partici-

pated therein even though Wunderlich was a stockholder in old Homemakers of which Wilsmann was president!

on earnings was to be determined and even contained a specific provision as to the maximum rate of interest to be charged by Upjohn to the new Homemakers subsidiary.

Contrary to the integration clauses in the closing document effecting the merger and in Wilsmann's employment agreement, Wilsmann contends that there was, again, an oral side agreement that conflicted with the foregoing documents. According to Wilsmann this was again done to mislead Wunderlich but there was no explanation as to why there was no written side agreement. In any case, Wilsmann contends that under this oral side agreement, instead of receiving 17,775 additional shares to be divided equally as under the first oral agreement, he and Campbell were to receive the cash equivalent of such shares, based on the 1969 value, tax free in five years, to be divided equally.[17] This payment would be made in order that they would receive the "true value" of their old Homemakers stock.

Wilsmann had another version of this second oral agreement which in part recognized the provisions in the August, 1969, letter of intent and in the merger document and employment agreement. It will be remembered that in the second letter of intent and in the merger document and employment agreement Wilsmann was to receive a bonus based on earnings of new Homemakers. Wilsmann contends that he "expressed concern that he would not receive the 'true value' under the written terms of the merger and employment contract, but plaintiff was assured by The Upjohn Company that said contract would be extended until plaintiff received the true value." App. 17. Thus his contention here was that he was guaranteed that the five year bonus agreement would be extended until he received the cash equivalent of the Upjohn shares originally promised. Under this version, it appears that Upjohn would not have an unqualified obligation to pay

the cash equivalent of 17,775 shares at the end of five years and, instead, that it would continue the bonus arrangement until the earnings of new Homemakers would support a cash distribution equivalent to the 17,775 shares.

While the employment agreement expressly placed a limit on the interest rate that Upjohn could charge for loans to the new Homemakers subsidiary, Wilsmann contends that Upjohn orally agreed that it would not finance new Homemakers by interest-bearing loans to it and that, therefore, in making such loans consistent with the employment agreement, Upjohn thereby reduced the profits of new Homemakers and that this also was fraudulent conduct. Wilsmann also contends that Upjohn failed, contrary to its promise, to use its detail men in promoting new Homemakers, and although the written agreements contained no obligation to do so, he contends that this failure reduced the profits of new Homemakers and that this also constituted fraud. Moreover, the original complaint alleged that "The Upjohn Company impliedly represented that the successor Homemakers['] net earnings which determined Plaintiff's 'back-end' payment would be calculated in a reasonable and good faith manner." App. 20. Thereafter it alleged that the net earnings were not so calculated and the complaint sets out twelve particulars in which there was fraud in the calculation of net earnings. App. 20–22. These claims of fraud which allegedly improperly reduced the profits of new Homemakers were apparently in support of Wilsmann's alternative theory, viz, that his "back-end" cash payment for the old Homemakers stock would ultimately come to him under the bonus agreement.

At the request of the chairman of Upjohn, on June 10, 1975, Wilsmann submitted a lengthy memorandum to support his contention that he had not received that which he had been promised by Upjohn. This document contains a great number of

17. It should be noted, however, that Wilsmann also testified that no person ever told him that they would not get the 17,775 shares contemplated by the first oral side agreement. App. 734.

complaints about the financing and operation of new Homemakers but contains no assertion that he had been promised a guaranteed "back end" payment for his old Homemakers stock. Wilsmann's reason for not including this, he testified, was that he had been requested by the chairman to omit it. App. 422.

Although Wilsmann alleged in his original complaint, by interlineation, that he had been employed "for life" (App. 22), in an amendment to the complaint he alleged that his discharge was "a nullity" because he could only be discharged by the board of directors of Homemakers and that the board had taken no such action.[18]

To summarize, not only are Wilsmann's contentions totally implausible but they are also in conflict each with the other:

Wilsmann contends that at the time the parties executed the first letter of intent the oral agreement was that he and Campbell were to receive, in any event, at the end of five years, 17,775 additional shares of Upjohn stock to be divided evenly. But he also contends, partially recognizing the option provision in the letter, that Upjohn orally agreed that it would not exercise the option to purchase his and Campbell's interest in new Homemakers until the earnings were such as would entitle them to 17,775 shares of Upjohn.

Wilsmann contends that at the time the parties executed the second letter of intent, the merger document and employment agreement, that the oral agreement was that he and Campbell were to receive, in any event, at the end of five years, the cash equivalent of 17,775 shares, valued as of 1969, with an additional amount to cover their taxes. But he also contends, partially recognizing the bonus provision in the letter, the merger document and the employment agreement, that Upjohn orally agreed that the five year contract providing for the bonus would be extended until he re-

ceived in bonus the cash equivalent of the Upjohn shares originally promised.

Thus we conclude that the jury was left to sheer speculation with respect to the alleged fraud that Wilsmann claimed induced him to enter into this merger agreement. A jury could not within reason find on this proof that Wilsmann had been a victim of fraud as he claimed. These contentions are at least to some degree mutually inconsistent and even conflicting. It is impossible to tell which theory or contention or combination thereof, if any at all, was accepted by the jury. A directed verdict or a judgment n.o.v. should have been granted to Upjohn. 9 Wright and Miller, Federal Practice & Procedure, § 2524.

## V

As stated, Upjohn also contends that the district court erred in not charging the jury on Upjohn's statute of limitations defense and in effect directed a verdict on that issue. We note that Wilsmann's counsel also requested the district court to submit the statute of limitations issue to the jury. While this claim of error presents a close question, we need not decide it since we are vacating the judgment on another ground.

## VI

On remand, it will be for the district court to determine whether it will continue to entertain the pendent claims under state law. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The judgment of the district court is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

---

18. This contention that Upjohn had orally promised Wilsmann employment "for life" is in direct conflict with the employment agreement. We note that Wilsmann does not contend that the employment agreement with respect to his tenure was also a subterfuge to mislead Wunderlich.