907 F.2d 150
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 O. Steven KLORER, Don J. Baumgartner, Maybern E. Mathews and
Ronald K. Turner, Plaintiffs-Appellants,
v.
Robert G. BENNETT, Bennett Management Corporation, the
Bennett Management Group, Bennett Restaurants Inc., Great
Lakes Restaurants, Inc., Great Lakes Restaurants of Ohio,
Inc., Dominic Sacca, Bennett Restaurants LJS Telegraph,
Inc., Bennett Restaurants # 518B, Inc., Bennett Restaurants
by Sylvania, Inc., Bennett Restaurants # 2548, Inc., John
Doe Partnership, John Doe, Inc., John Doe, Defendants-Appellees.
 
 No. 89-3430.
 United States Court of Appeals, Sixth Circuit.
 July 9, 1990.
 Before KENNEDY and NATHANIEL R. JONES, Circuit Judges, and ROBERT E. DEMASCIO, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiffs, a group of investors (hereinafter "plaintiffs-investors"), appeal the district court's directed verdict dismissing their claims brought pursuant to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1988). Because we find that the evidence adduced at trial fails to establish a securities fraud claim, we affirm.
 
 I.
 
 2
 The plaintiffs-investors and defendant Robert G. Bennett are joint owners of several fast food restaurants, including a Burger King Restaurant located in Monroe, Michigan, referred to by the parties as "BK Monroe." The transactions and representations surrounding the formation of BK Monroe are the bases for the plaintiffs-investors' section 10(b) claims. Don Baumgartner's interest in building a Burger King restaurant on property he owned first brought Bennett and him together. In late 1975, Baumgartner met with Bennett to discuss the creation of a Burger King Restaurant in Sylvania, Ohio. These negotiations eventually turned to consideration of developing a Burger King Restaurant in Monroe, Michigan, where Bennett possessed an exclusive right to develop Burger King franchises and had already begun laying the groundwork for such an operation.
 
 
 3
 Bennett was in the business of developing Burger King and other fast food franchises in northwestern Ohio, southeastern Michigan and Fort Wayne, Indiana. Baumgartner was also in the business of developing restaurants, albeit not fast food chains like Burger King. Plaintiff-investor Klorer had no restaurant experience but owned and operated a mechanical services firm. Baumgartner solicited Klorer's participation in the development of BK Monroe. Likewise, Baumgartner invited plaintiff-investor Mathews to invest in BK Monroe. Mathews owned an accounting firm as well as a company called M & H Transport Service Company. A fourth plaintiff-investor is not a party to this appeal.
 
 
 4
 Bennett proposed to the plaintiffs-investors that two business entities be formed in connection with the creation and operation of BK Monroe. The first, the BBLM partnership, would own the real estate on which BK Monroe would be situated. The second entity, Bennett Restaurants BK Monroe, Inc. (hereafter "BK Monroe, Inc."), would handle the restaurant's operations.
 
 
 5
 In a letter dated April 9, 1976, Bennett set forth the land purchase and site improvement costs for BK Monroe, which totalled $310,000. The letter indicated that Baumgartner and the investors he brought in would together pay $65,000. Bennett's matching portion was to be represented entirely by debt. In other words, the plaintiffs-investors would be responsible for providing the partnership's cash equity. With regard to the operating company, the letter proposed that the plaintiffs-investors together invest $60,000 in cash in exchange for a 40% interest in the operating company. Bennett was to receive a 60% interest in the operating company but did not state what, if anything, he would contribute for this interest. The letter also included a promise to hire an operating partner to develop a market for BK Monroe. The operating partner was to receive a salary of $25,000 and 30% of the earnings of the operating corporation. The operating partner would be required to buy a 30% ownership in the operating company from the investors payable from his 30% earnings. The letter concluded with the following language: "It is anticipated that the Monroe, Michigan market can support two Burger King restaurants. As a part of this agreement, you and your partners will be granted an option to develop the second restaurant with me upon these same terms and conditions." Baumgartner responded with a counter offer.
 
 
 6
 In September 1976, Bennett and the plaintiffs-investors purchased the real estate for BK Monroe for $100,000.00. Each of the four plaintiffs-investors contributed $25,000.00. At trial, the plaintiffs-investors testified that Bennett had represented to them that $10,000.00 of each their investments would be used for land and acquisition costs, and $15,000.00 of each investment would be used as a subscription for the stock of BK Monroe, Inc., the operating corporation. The monies contributed to the operating company were expected to be used in satisfaction of the $60,000.00 purchase price for the plaintiff-investors' 40% interest in the operating company. Bennett, however, contended that the $25,000.00 each was to be contributed to land costs alone.
 
 
 7
 Following the purchase of the land, a formal Letter of Agreement concerning the operating company was signed by all parties. Bennett was responsible for the drafting of this document. The Letter of Agreement, dated January 3, 1977, provided that "[i]n consideration for 60% or 30,000 shares of the stock of the corporation, Robert G. Bennett will agree to assign his franchise rights to this unit to the operating corporation." Id. at 298. The plaintiffs-investors allege that during the course of acquiring and developing the BK Monroe site, Bennett surreptiously applied for and obtained a franchise agreement with Burger King in his individual name. Bennett used his own money, $29,500.00, to acquire the franchise agreement but is accused of improperly reimbursing himself with funds from the operating company. The parties dispute whether Bennett's assignment of his "franchise rights" meant that Bennett would transfer the franchise to the ownership of B.K. Monroe, Inc.
 
 
 8
 The Letter of Agreement also states the following disclaimer regarding the rights of the plaintiffs-investors to participate in future Bennett restaurant ventures: "The shareholders have no right to participate in any future development whatsoever." According to the plaintiffs-investors, Bennett discussed with them during the summer of 1979 the development of a second Burger King Restaurant in Monroe, Michigan. The plaintiffs-investors testified that they expressed a desire to participate in the second Monroe Burger King but that they were not allowed to do so. There are currently three Burger King in Monroe, two of which are owned by Bennett alone.
 
 
 9
 The Letter of Agreement was followed by a pre-organization share subscription agreement for BK Monroe. The subscription agreement contains several provisions relevant to this appeal. Regarding Bennett's contribution in exchange for his 60% ownership of BK Monroe, Inc., the agreement provides that Bennett is to give "his absolute assignment to the Company of the right, franchise and license to operate a single Burger King Restaurant at 881 South Monroe Street, on the basis that such franchise has a value of $90,000.00...." J.App. at 311.
 
 
 10
 The franchise for BK Monroe was never contributed to the operating company. At trial, Bennett contended that it was not supposed to be contributed because he was only to contribute the rights he owned from Burger King Corporation (BKC) to develop BK Monroe, not the actual franchise itself. Bennett characterized the language used in the subscription agreement as "a bad choice of words." Id. at 206.
 
 
 11
 As to the opening of other Burger King restaurants in Monroe, Michigan, the subscription agreement further provided that Bennett could not develop other Burger King franchises within the same "territory" as BK Monroe. The plaintiffs-investors claim that Bennett breached this commitment. However, Bennett adduced evidence at trial that the term "territory" had a specific trade usage. He testified that BKC controlled the definition of the term and that under BKC's definition, a new Burger King is in the same territory as an existing one if it reduces the established Burger King's profits by 10% or more. According to Bennett, under this definition, neither of the two Burger Kings he erected after BK Monroe are within the same territory as BK Monroe. Finally, the plaintiffs-investors also introduced evidence that Bennett made misrepresentations to them regarding certain management services and the hiring of an operations officer for BK Monroe.
 
 
 12
 The plaintiffs-investors filed the instant action on November 13, 1987 in the United States District Court for the Northern District of Ohio, Judge Walinski presiding. The multi-count complaint alleged violations of sections 12(2) and 17(c) of the Exchange Act of 1933, 15 U.S.C. Secs. 771(2) and 779(a); section 10(b) of Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b); and various state laws. The complaint named as defendants, inter alia, Bennett and BKC. All claims against BKC were dismissed on May 18, 1988. The remaining defendants filed a motion to dismiss the plaintiffs-investors' federal securities claims on March 6, 1989. The district court granted the motions as to claims asserted under section 12(2) and 17(c) of the Exchange Act of 1933 but denied the motions as to the plaintiffs-investors' 10(b) claims.
 
 
 13
 In April 1989, the case was tried to a jury. On April 25, at the conclusion of the plaintiffs-investors' evidence, the district court directed a verdict for defendants on the 10(b) claims and dismissed without prejudice the plaintiffs-investors' pendent state law claims because: "[T]he Federal Securities Act violations were premised on contracts or offers of contracts involving shares of various corporations, the contracts or offers were negotiated at arms length by businessmen of equal sophistication, and there is no evidence of misleading false statements that could constitute a securities violation."
 
 II.
 
 14
 We employ the same standard as the district court in determining the propriety of a directed verdict. Without weighing credibility or considering the weight of the evidence, if this court determines that there is substantial evidence from which a jury could find for the plaintiffs-investors, then we must reverse the district court's entry of a directed verdict for Bennett. Coffy v. Multi-County Narcotics Bureau, 600 F.2d 570, 579 (6th Cir.1979). We view the evidence in a light most favorable to the non-moving party, and we allow entry of a directed verdict only if reasonable jurors could come to but one conclusion. Id.
 
 
 15
 Securities Exchange Commission Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1989), promulgated pursuant to section 10(b) of the Securities Exchange Act of 1934, provides:
 
 
 16
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 17
 (a) To employ any device, scheme, or artifice to defraud,
 
 
 18
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 19
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 
 
 20
 in connection with the purchase or sale of any security.
 
 
 21
 Bennett contends that the plaintiffs-investors' allegations of material misrepresentations and omissions amount to nothing more than a claim that he operated BK Monroe in a manner not suited to the plaintiffs-investors. Such internal corporate managements disputes are not actionable under Rule 10b-5. Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971).
 
 
 22
 'As a general matter ... private Sec. 10(b)/Rule 10b-5 damage claims can be said to require: 1) the use of jurisdictional means 2) to implement a deceptive or manipulative practice (with the requisite scienter) 3) in connection with 4) the purchase or sale 5) of a security 6) causing 7) damages.'
 
 
 23
 Wilsman v. Upjohn Co., 775 F.2d 713, 719 (6th Cir.1985) (citations omitted), cert. denied, 476 U.S. 1171 (1986). Upon scrutiny of the plaintiffs-investors' claims and the evidence in support thereof, we agree with the district court that the plaintiffs-investors have failed to assert a violation of Rule 10b-5.
 
 
 24
 The plaintiffs-investors testified at trial that it was their understanding that 60% that their initial investment of $100,000.00 would be used to purchase stock in the operating company, BK Monroe, Inc. Contrary to their expectations, the total sum was contributed to the BBLM partnership in order to purchase the land for BK Monroe. We doubt whether Rule 10b-5 is applicable to the BBLM partnership. "Normally, a general partnership interest is not considered a 'security'. The managerial powers vested in general partners and the express right of inspection of documents gives them the kind of leverage and ability to protect themselves that takes them outside the intended scope of the '34 Act." Odom v. Slavik, 703 F.2d 212, 215 (6th Cir.1983) (citations omitted). However, insofar as the plaintiffs-investors allege that the partnership was itself created as part of a scheme to defraud them in their purchase of securities in BK Monroe, Inc., misrepresentations concerning the amounts to be allocated to the partnership may be actionable under Rule 10b-5. See Less v. Lurie, 789 F.2d 624, 626 (8th Cir.1986) (misrepresentations regarding general partnership that was created to facilitate fraudulent sale of security interests may give rise to Rule 10b-5 liability). On the facts of the instant case, however, an allegation of the latter sort must fail because no reasonable juror could find that Bennett misinformed the plaintiffs-investors of how their initial investment would be allocated.
 
 
 25
 Bennett stated in his letter of April 9, 1976 that "[t]he price of the land purchase is $100,000...." This was the sum of the plaintiffs-investors' initial investment. Plaintiff-investor Klorer testified that the purchase of the land was an immediate priority because there was an option on the land which was about to run out. J.App. at 166-A. This is why the plaintiffs-investors made their initial investment without even executing documents. Id. The plaintiffs-investors did not introduce into evidence documents written by Bennett which support their understanding of how of their initial investment was to be allocated. Indeed, subsequent to the purchase of land in September 1976, the plaintiffs-investors signed a subscription share agreement for BK Monroe, Inc. which did not credit them as having already paid $15,000.00 a piece for stock in BK Monroe, Inc. The agreement stated that "[a]s consideration for the sale and issuance of Subscriber's Shares, Subscriber shall pay Company ... the sum of $3.00 per share for an aggregate of $15,000.00...." Id. at 304. Having acceded to the terms of an offering memorandum which did not reflect Bennett's alleged representations concerning the allocation of their initial $100,000.00 investment, the plaintiffs-investors cannot claim that they reasonably relied on any misrepresentation Bennett may have made. See Kennedy v. Josephthal & Co., Inc., 814 F.2d 798, 805 (1st Cir.1987) (Investors who passively accepted contradictions between offering memorandum and brokers' statements cannot show they justifiably relied on any alleged misrepresentations and therefore may not maintain an action under Rule 10b-5). Moreover, the plaintiffs-investors did not introduce evidence that they did not receive an ownership interest in the land they purchased. As such, there is no allegation of fraud, and evidence concerning the plaintiffs-investors' initial $100,000.00 investment did not present a jury question as to a violation of Rule 10b-5.
 
 
 26
 The plaintiffs-investors allege that Bennett fraudulently induced them into buying BK Monroe, Inc. stock by promising them participation in future Bennett restaurant ventures and promising not to open other Burger King Restaurants in the same "territory" as BK Monroe. In his April 9, 1976 letter, Bennett did grant to the plaintiffs-investors the option to develop a second restaurant. This aspect of the letter, however, did not carry over into the formal documents which the parties executed. In the formal Letter of Agreement which was signed by all parties, Bennett expressly stated that "[t]he shareholders have no right to participate in any future development whatsoever." J.App. at 300. Having acceded to this condition, the plaintiffs-investors cannot now claim misrepresentation in violation of Rule 10b-5.
 
 
 27
 Furthermore, there is no evidence that Bennett breached or made misrepresentations with respect to his promise not to open other Burger King Restaurants in the same "territory" as BK Monroe. The plaintiffs-investors did not refute Bennett's testimony that the term "territory" has a trade usage: if sales of an existing Burger King would be reduced by 10% or more by the opening of a new one, then the new one is in the same territory as the existing one. Instead, the plaintiffs-investors claim that Bennett's failure to inform them of the unique trade usage definition of "territory" constituted a material omission in violation of Rule 10b-5. With respect to the duty to disclose, Rule 10b-5 "posits a broad continuum ranging from fiduciaries, whose affirmative duty of disclosure is unparalleled, to complete strangers, who need only refrain from intentional misrepresentations." Stephenson v. Calpine Conifers II, LTD., 652 F.2d 808, 813 (9th Cir.1981), overruled on other grounds, In Re Washington Pub. Power Supply Sys. Sec. Lit., 823 F.2d 1349 (9th Cir.1987). The factors relevant to determining the existence of a duty to disclose are: (1) the relationship of the defendant to the plaintiff; (2) the parties' relative access to information; (3) the benefit the defendant obtained from the relationship; (4) the defendant's awareness of the plaintiff's reliance on him; and (5) the defendant's actions in commencing the securities transaction at issue. Id. The plaintiffs-investors in the instant case are relatively sophisticated businessmen who have negotiated contracts before. As arms-length negotiators, the plaintiffs-investors were in a position to clarify or define the term "territory" but simply acquiesced. We decline to impose on Bennett a duty to disclose of the magnitude that the plaintiffs-investors now urge.
 
 
 28
 We further hold that a jury could not find that Bennett intended to defraud the plaintiffs-investors by failing to define "territory" because not even Bennett could be certain of its definition. "Fraud or deceit presupposes the superior knowledge of one party over another." Securities and Exchange Commission v. Coffey, 493 F.2d 1304, 1313 (6th Cir.1974), cert. denied, 420 U.S. 908 (1975). It was BKC that conducted studies of geographic areas to determine whether additional Burger King Restaurants could be placed at any site proposed by Bennett. Given this circumstance, Bennett was not assured of opening the two Burger Kings in Monroe, Michigan that he erected after BK Monroe. "Issues of non-disclosure ... are to be determined by the situation and knowledge of the parties at the time they committed themselves, and not on the basis of subsequent events...." Pittsburgh Coke & Chemical Co. v. Bollo, 421 F.Supp. 908, 923 (E.D.N.Y.1976), aff'd, 560 F.2d 1089 (2d Cir.1977).
 
 
 29
 The plaintiffs-investors also contend that a jury question was presented regarding whether Bennett was to contribute his "franchise rights" to BK Monroe or the actual franchise agreement which he purchased for $29,500.00 from the Burger King Corporation. The subscription agreement indicated that Bennett would "irrevocably transfer and assign to company the franchise and license to operate a single Burger King Restaurant." However, in the formal Letter of Agreement, Bennett specifically agreed to assign only his "franchise rights." Bennett claims that this language means he was to invest his "franchise rights" while the plaintiffs-investors interpret the clause to mean the franchise is to be placed in BK Monroe's ownership. Neither party has clearly defined the difference between "franchise" versus "franchise rights," but a review of the franchise agreement purchased by Bennett from Burger King Corporation reveals that the agreement embodies the right to operate a Burger King at the location where BK Monroe is now operated.[1] We recognize that "[e]ntering into a contract of sale with the secret reservation not to fully perform it is fraud cognizable under Sec. 10(b)." Walling v. Beverly Enterprises, 476 F.2d 393, 396 (9th Cir.1973). However, the plaintiff must show actionable fraud from the surrounding circumstances; absent such fraud, the plaintiff states a mere breach of contract action. Id. 397. While we acknowledge that there is semantical confusion concerning the terms "franchise" and "franchise rights," we are unable to discern any surrounding circumstances which would imply fraud. Rather, it is apparent that the plaintiffs-investors have attempted to transform a contract construction dispute into a federal cause of action.
 
 
 30
 The plaintiffs-investors next allege that Bennett has been charging management fees substantially beyond the estimated $520.00 per month stated in a 1977 letter. They charge that Bennett has been paying bonuses to himself, thereby reducing their earnings. This claim is meritless because the $520.00 per month figure was merely an estimate for the year 1977. That Bennett is paying himself bonuses raises questions of internal corporate management to which Rule 10b-5 does not apply. "Section 10(b)'s fundamental purpose is to assure that full information is available to decision makers in security transactions. Protection of those who have entrusted the decision making to others is a concern of state law, for which a cause of action under Sec. 10(b) should not be inferred." O'Brien v. Continental Illinois Nat. Bank & Trust, 593 F.2d 54, 60 (7th Cir.1979) (citations omitted).
 
 
 31
 Finally, the plaintiffs-appellants claim that Bennett, contrary to his representations, failed to hire an operating partner who would work exclusively for BK Monroe. An operator was hired initially but failed to perform work exclusively on behalf of BK Monroe. While this may state a breach of contract claim, it does not rise to the level of a Rule 10b-5 violation.
 
 III.
 
 32
 Assuming that the district court erred in directing a verdict for the defendant, the plaintiffs-investors argue that the court should retain jurisdiction of their pendent state claims. Because we find that the district court properly directed a verdict on the plaintiffs-investors' 10(b) claims, the pendent state claims were properly dismissed. Foster v. Walsh, 864 F.2d 416, 419 (6th Cir.1988) (per curiam).
 
 IV.
 
 33
 For the foregoing reasons, the district court's entry of a directed verdict for the defendant is AFFIRMED.
 
 
 
 *
 The Honorable Robert E. DeMascio, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The Franchise Agreement also provides that:
 If the rights of Franchisee are assigned to a corporation, the Franchisee shall be the legal and beneficial owner of the stock of the assignee corporation and shall act as such corporation's principal officer. Provided Franchisee retains controlling interest of the assignee corporation, it may sell, transfer or assign stock in such assignee corporation to members of its immediate family or to a trustee in trust for same, to its operating managers or to other franchisees of Company if the franchisee to whom such stock interest is assigned is not then in default of any of the terms of other franchise agreements with Company.
 Although the record contains no document of a formal assignment, Bennett is the majority shareholder and principal officer of B.K. Monroe, Inc., and, functionally, the use to which his franchise rights are being put is on behalf of B.K. Monroe, Inc.